UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| PROSPEED.NET, INC., | ) | Case No. 03-44857-JBR |
|  | ) | **05-40007**FDS |
| Debtor. | ) |  |

## OPPOSITION OF THE OPERATING TELEPHONE COMPANY SUBSIDIARIES OF VERIZON COMMUNICATIONS INC. TO THE DEBTOR'S MOTION TO UNITED STATES DISTRICT COURT FOR LEAVE TO APPEAL INTERLOCUTORY ORDER

The Operating Telephone Company Subsidiaries of Verizon Communications Inc. ("Verizon") submit this Opposition To The Debtor's Motion To United States District Court For Leave To Appeal Interlocutory Order dated December 20, 2004 (the "Motion"). The Motion seeks leave to appeal an order of the United States Bankruptcy Court dated December 10, 2004 (the "Interlocutory Order") denying approval of the Debtor's Disclosure Statement dated June 10, 2004, and specifically identifying as a ground for its decision the Bankruptcy Court's agreement with the "analysis and reasoning of Verizon" that Section 366 of the Code does not "preempt" Section 365 and that the Debtor must cure the substantial arrearages due Verizon under the parties' prepetition agreements if it wishes to receive the same contractually-furnished services and facilities, post-confirmation, on the terms specified in the parties' prepetition agreements. A true and accurate copy of the Interlocutory Order is attached hereto as Exhibit A.

### INTRODUCTION:

The Motion should be denied because it does not present a controlling issue of law, the resolution of which will advance the ultimate termination of the litigation. Rather, allowance of the Motion would delay the ultimate termination of the litigation by inviting piecemeal appeals

and wasting judicial resources. The Motion seeks leave to appeal the Interlocutory Order on the ground that the "outcome of the Chapter 11 Case lies solely upon whether the Verizon debt is treated pursuant to Section 366 or Section 365" (Motion, ¶8). The Debtor's statement is plainly incorrect because the Disclosure Statement dated June 10, 2004 (the "Disclosure Statement") lacks adequate information – indeed, it fails to make any disclosure on numerous important matters – and the Debtor's plan of reorganization described by the Disclosure Statement dated June 10, 2004 (the "Plan") is patently unconfirmable for additional reasons beyond the Plan's failure to comply with Section 365 of the Code. These additional fatal flaws include that the Plan: (A) violates the absolute priority rule under Section 1129(b)(2)(B) of the Bankruptcy Code by providing that existing shareholders will retain their equity even though holders of allowed unsecured claims will be paid no more than 20% of what they are owed (over three years); and (B) is not feasible within the meaning of Section 1129(a)(11). True and accurate copies of the Debtor's Disclosure Statement And Plan are attached hereto as Exhibits B and C, respectively. As a result, the Disclosure Statement and the Plan could not be approved even if this Court agreed with the Debtor's "preemption" argument and this appeal does not therefore present a controlling issue of law, the resolution of which will expedite these bankruptcy proceedings.

Moreover, there are no substantial bases for disagreement with the Bankruptcy Court's resolution of the one issue that court addressed, the Debtor's "preemption" agreement. As the Bankruptcy Court recognized, that argument flies in the face of the plain language of the Bankruptcy Code and is contrary to the well-established practice in dozens upon dozens of telecommunication bankruptcy cases.

For each of these reasons, leave to appeal the Interlocutory Order should be denied.

{J:\CLIENTS\ban\303402\0001\00497434.DOC;1}

In further support of this Objection, Verizon states:

## FACTUAL BACKGROUND:

1.    On August 19, 2003 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, United States Bankruptcy Court, District of Massachusetts, Case No. 03-44857-JBR.

2.    The Debtor is a telecommunications provider of Internet service and related data services to retail customers, primarily using digital subscriber line technology. To provide such services to its customers, the Debtor must, in turn, obtain a variety of telecommunications services and facilities from Verizon, including collocation, access, and unbundled network elements. The Debtor obtains such services and facilities from Verizon under a series of executory contracts, principally interconnection agreements.

3.    The Debtor filed its Disclosure Statement and Plan on June 10, 2004.

4.    On July 19, 2004 Verizon filed the Objection of Verizon Communications Inc. To The Debtor's Disclosure Statement dated June 10, 2004. Verizon's Objection argued that the Court should deny approval of the Disclosure Statement because the Disclosure Statement did not contain adequate information to permit creditors to make an informed judgment about the Plan and because the Plan it described was patently unconfirmable in that (a) it fails to provide for the cure of the Debtor's substantial prepetition defaults under its agreements with Verizon as required by section 365(b)(1) of the Code if the Debtor wishes to assume those agreements and continue to provide services to its customers; (b) it violates the absolute priority rule under section 1129(b)(2)(B) of the Code; and (c) it is not feasible within the meaning of section 1129(a)(11) of the Code.

5.    At the commencement of the hearing held on August 5, 2004 on the Disclosure Statement, and prior to the Bankruptcy Court's addressing any of the specific objections raised by Verizon in its Objection to the Disclosure Statement, the Debtor requested an opportunity to submit a memorandum of law on the issue of whether Section 366 of the Code "preempts" Section 365 and requires Verizon to continue to provide the same services and facilities to the Debtor, post-confirmation, on the same terms as specified in the parties' existing agreements under which the Debtor ordered those services and facilities in the first place, notwithstanding the Debtor's apparent intent to reject those very agreements under its proposed Plan. The Court granted the Debtor's request to brief this issue.

6.    On August 20, 2004 the Debtor filed its Memorandum Of Law Concerning The Non-Applicability of 11 U.S.C. Section 365(b)(1) To The Plan of Reorganization of Prospeed.Net, Inc.

7.    On September 2, 2004 Verizon filed it Response To Debtor's Memorandum Of Law Concerning The Non-Applicability of 11 U.S.C. Section 365(b)(1) To The Plan of Reorganization of Prospeed.Net, Inc. A true and correct copy of Verizon's Response (without attachments) is annexed hereto as Exhibit D.

8.    On September 9, 2004 the Court conducted a hearing and informed the parties that it agreed with Verizon's position that Section 366 does not "preempt" Section 365. However, the Court did not address any of the remaining objections raised by Verizon in its Objection to the Disclosure Statement. A true and accurate copy of the transcript of the hearing is attached hereto as Exhibit E. By agreement of the parties, the Court deferred the entry of an order denying approval of the Disclosure Statement pending further negotiations between the Debtor and Verizon of a possible consensual resolution to Verizon's Objections to the Disclosure

Statement and Plan, including whether the Debtor's shareholders were willing to contribute new value as required by the absolute priority rule.

9.    At a hearing held on December 10, 2004 the parties reported to the Court that they had been unable to reach a consensual resolution of their dispute and the Court entered an order denying approval of the Disclosure Statement.

10.    On December, 20, 2004 the Debtor filed a Notice of Appeal of the Bankruptcy Court's Order dated December 10, 2004.    The Debtor acknowledged therein that the Interlocutory Order was, in fact, interlocutory (all it did was disapprove the Disclosure Statement; the Debtor's bankruptcy case remains pending in the Bankruptcy Court) and the Debtor therefore needs leave to so appeal under 28 U.S.C. § 158(a)(3) and Rule 8001(b) of the Federal Rules of Bankruptcy Procedure.

## ARGUMENT:

11.    The Motion fails to establish any of the elements necessary for the granting of discretionary leave to appeal the Interlocutory Order.  The Motion does not present a controlling issue of law, but merely identifies one of the many disputed issues of law that must be resolved in the Debtor's favor to permit confirmation of a plan.   The Debtor requires a favorable resolution not only of the single issue presented in the Motion (whether section 366 "preempts" section 365), but also of the remaining objections raised in Verizon's Objection to the Debtor's Disclosure Statement (the Debtor's failure to comply with the absolute priority rule, feasibility, adequacy of disclosures).  Granting the Debtor leave to appeal on the single issue presented in the Motion will delay rather than advance the ultimate termination of the litigation, invite piecemeal appeals, waste judicial resources, and contravene the concept of final adjudication in the bankruptcy courts as contemplated by Congress when it enacted the Bankruptcy Code.

{J:\CLIENTS\ban\303402\0001\00497434.DOC;1}

Moreover, the Bankruptcy Court's reading of the Bankruptcy Code, as reflected in the Interlocutory Order, is plainly correct.

### Standard For Granting Leave To Appeal:

12.    Leave to appeal an interlocutory order is granted only if the appeal (1) "involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion", and (3) whether "an immediate appeal from the order may materially advance the ultimate termination of the litigation." In Re Watson, 309 B.R. 652, 659 (1st Cir. BAP 2004); In Re Bank of New England Corp., 218 B.R. 643, 652 (1st Cir. BAP 1998); Huckeby v. Frozen Food Express, 555 F.2d 542, 548-49 (5th Cir. 1977). Circuit law limits the "statutory anodyne" of certification of interlocutory appeals to "rare cases." In Re San Juan Dupont Plaza Hotel Fire Litigation, 859 F. 2d 1007, 1010, n. 1 (1st Cir. 1988).[1] Here, the legal issue presented on appeal is not controlling; its adjudication at this stage of the proceeding will not advance the ultimate termination of this litigation but simply prolong it; and the Debtor's arguments on the merits are baseless.

## I.    This Appeal Does Not Involve Controlling Issue of Law, the Resolution of Which Will Advance the Bankruptcy Proceedings.

13.    The legal issue presented in the Motion (whether Section 366 "preempts" Section 365) does not involve a controlling issue of law that will advance the ultimate termination of the litigation because the Plan is patently unconfirmable for reasons independent of and in addition to the Debtor's failure to comply with Section 365 of the Code. First, the Plan is facially defective for failing to comply with the absolute priority rule. Second, the parties dispute the feasibility of the Plan and will litigate that issue at the confirmation hearing. Third, the

---

[1] While this appeal is governed by 28 U.S.C. § 158(a)(3), most courts utilize the same standards as govern the propriety of district courts' certification of interlocutory appeals to the circuit courts under 28 U.S.C. § 1292(b). In Re Bank of New England Corporation, 218 B.R. at 652.

{J:\CLIENTS\ban\303402\0001\00497434.DOC;1}

-6-

Disclosure Statement lacks adequate information within the meaning of Section 1125.   Indeed, the issues that the Bankruptcy Court has yet to address and that remain to be litigated in this case are potentially dispositive.

## The Plan Fails To Comply With The Absolute Priority Rule:

14.    The Plan is patently unconfirmable because it fails to comply with the absolute priority rule under section 1129(b) of the Code, which requires a senior class of creditors be paid in full before a junior class receives any distribution, unless the senior class agrees otherwise. The Plan provides that existing shareholders will retain their equity in the Debtor even though the holders of allowed general unsecured claims will not be paid in full (Disclosure Statement, p. 11) – indeed, will be paid no more than 20% of what they are owed (over three years) – and even though the Debtor's shareholders do not propose to provide any new value.  Verizon does not intend to accept such an inequitable Plan, and the Debtor does not suggest that it can obtain the acceptance of the class of general unsecured creditors notwithstanding the rejection of the Plan by Verizon, which is by far the Debtor's largest creditor.  Accordingly, the only way the Debtor's shareholders may retain their stock is if they pay all unsecured creditors in full – more than $310,000.00 to Verizon alone – something the Debtor does not propose to do, nor claims it could do.  The Plan is not confirmable on its face.

## The Plan Is Not Feasible:

15.    The parties also dispute the feasibility of the Debtor's Plan.  The Debtor is unable to satisfy its burden that the Plan described in the Disclosure Statement is feasible as required by Section 1129(a)(11).  It is the Debtor's burden to show that the Plan is feasible.  See, In re Danny Thomas Properties II Limited Partnership, 241 F.3d 959 (8th Cir. 2001); In re Miraj & Sons, Inc., 197 B.R. 737 (Bankr. D. Mass. 1996).  To satisfy its burden, the Debtor must show that the Plan

{J:\CLIENTS\ban\303402\0001\00497434.DOC:1}

offers a reasonable assurance of success and must be "firmly rooted in predictions based on objective fact." In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985). The Debtor's Plan is not feasible because the Debtor has not demonstrated that it will generate sufficient funds to pay creditor claims, nor has it even identified the universe of creditor claims asserted against the Debtor's estate.

16.    The Debtor will need to pay a single creditor, Verizon, more than $310,000.00 in order for the Debtor to assume its critical agreements with Verizon and for the Debtor's shareholders to retain their interests.[2] The Debtor admits that it lacks the funds to do so. Indeed, the Debtor's Monthly Operating Report for the period ending October 31, 2004 discloses only $25,308 in cash on hand. The Plan is thus not feasible.

## The Disclosure Statement Lacks Adequate Information:

17.    Verizon also objected to the adequacy of the information contained in the Disclosure Statement, and the parties will continue to litigate this issue. Section 1125 requires that the Disclosure Statement provide "adequate information" that "would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). The purpose of this requirement is to allow creditors to vote and participate in the plan process based on informed judgment. See Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 54 (Bankr. S.D.N.Y. 1999). As the courts have repeatedly held, full disclosure "is crucial to the effective functioning of the federal bankruptcy system[;] ... the importance of full and honest disclosure cannot be overstated." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996). See also

---

[2] On August 5, 2004, Verizon filed a Proof of Claim in the amount of $310,040.63. The Debtor has not objected to Verizon's Proof Of Claim.

Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir.), cert. denied, 488 U.S. 967 (1988) ("we cannot overemphasize the Debtor's obligation to provide sufficient data to satisfy the code standard of 'adequate information'"); In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("Given the necessity for adequate information in the Disclosure Statement and the paramount importance Section 1125 occupies in the Chapter 11 process, there is little, if any, room for harmless error").

18.     The information set forth in the Disclosure Statement is deficient, or even misleading, in a number of respects.  First, the Disclosure Statement repeatedly asserts that the Debtor is "operating profitably" (Disclosure Statement, pp. 3, 10, 11), but the Income Statement attached as an exhibit to the Plan omits expense items that are essential in ascertaining the Debtor's level of profitability including, but not limited to, ongoing Chapter 11 administrative expenses, capital expenditures, and the existence of any net operating losses.  Moreover, the Disclosure Statement does not include financial projections for the three-year period over which the Debtor proposes to pay a total of $55,000 to general unsecured creditors.

19.     Second, the Disclosure Statement fails to disclose alleged insider loans made by the Debtor to one or more officers and directors.  Mr. Ira Kleiner, a shareholder and former officer of the Debtor, has asserted in writing that the Debtor made several hundred thousand dollars in loans to insiders of the Debtor.

20.     Third, as noted, the Disclosure Statement does not address at all the assumption or rejection of the Debtor's executory contracts and unexpired leases.

21.     Fourth, the Disclosure Statement does not disclose the identity and affiliations of those individuals who propose to serve as officers and directors of the Debtor, something that is absolutely required.  11 U.S.C. § 1129(a)(5).

{J:\CLIENTS\ban\303402\0001\00497434.DOC;1}

22.    Fifth, the Disclosure Statement does not explain that the actual distribution to unsecured creditors may be less that the 20% projected distribution since the dollar amount of proofs of claim that may be filed by creditors before the deadline for doing so established in the bankruptcy case (February 1, 2005) and ultimately allowed in the bankruptcy proceedings may exceed the dollar amount of general unsecured claims that the Debtor has scheduled. That fact is particularly relevant since the Debtor proposes to cap the distribution to general unsecured creditors at $55,000 even if that amount provides a dividend of less than the projected 20%. Disclosure Statement, at 16-17.

23.    Sixth, the Disclosure Statement misleadingly states that Verizon's prepetition claim amounts to only $228,000 by Verizon's own calculation. Disclosure Statement, at 10. In fact, Verizon's claim relating to Massachusetts alone amounts to approximately that amount but, when New Hampshire is added, the total claim exceeds $310,000. And, if the Debtor rejects its agreements with Verizon in New Hampshire, as the Debtor has suggested it will do, Verizon may have additional rejection damage claims.

## II.    There Are No Substantial Grounds for Disagreement with the Bankruptcy Court's Interlocutory Order.

24.    Finally, there are no substantial grounds for disagreement with the Bankruptcy Court's rejection of the Debtor's "preemption" argument. The Bankruptcy Code expressly obligates a debtor that wishes to continue, after it emerges from bankruptcy, to retain the benefits of services provided to it pursuant to an executory contract to assume that contract and to cure all defaults thereunder (i.e., to pay all amounts owed). 11 U.S.C. § 365. The Debtor's argument here that Section 365 does not apply simply because the services Verizon provides the Debtor under its contract could be deemed "utility services" not only flies in the face of the Bankruptcy Code itself -- nothing in Section 365 suggests it does not apply to "utility" contracts -- but also

contradicts the well-established practice in numerous telecommunications bankruptcy cases in which debtors have assumed under Section 365 their interconnection and other agreements for telecommunications services. Rather than repeat the points it made below, which the Bankruptcy Court found persuasive, Verizon simply refers the Court to its brief before the Bankruptcy Court, a copy of which (without attachments) is annexed hereto as <u>Exhibit B</u>.

WHEREFORE, the operating telephone subsidiaries of Verizon Communication, Inc. respectfully request that the Court enter an order denying the Debtor's Motion To United States District Court For Leave To Appeal Interlocutory Order and granting Verizon other and further relief as the Court deems just and proper.

<div style="margin-left:40%">

THE OPERATING TELEPHONE COMPANY SUBSIDIARIES OF VERIZON COMMUNICATIONS INC.

By Their Attorneys,

/s/ Mark W. Powers
Mark W. Powers (BBO #555337)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA  01615-0156
Tel: (508) 791-3511

and

Philip D. Anker
Joel Millar
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY  10022
Tel: (212) 230-8800

</div>

DATED:  January 6, 2005

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In Re: ) | Chapter 11 |
| ) | |
| PROSPEED.NET, INC. ) | Case No. 03-44857-JBR |
| ) | |
| Debtor. ) | |

## CERTIFICATE OF SERVICE

I, Mark W. Powers, hereby certify that on this 6th day of January, 2005 I served a copy of the Objection Of The Operating Telephone Subsidiaries Of Verizon Communications Inc. To The Debtor's Motion To United States District Court For Leave To Appeal Interlocutory Order on the parties listed on the attached service list via first class mail, postage prepaid, unless notified electronically by the ECF System.

/s/ Mark W. Powers

Timothy M. Mauser, Esq.
Mauser & Mauser
180 Canal Street
Boston, MA 02114
(*Counsel for the Debtor*)

Prospeed.Net, Inc.
164 Westford Road
Tyngsboro, MA 01879
(*the Debtor*)

Richard King, Esq.
Office of the United States Trustee
600 Main Street, Suite 200
Worcester, MA 01608

Philip D. Anker, Esq.
Wilmer, Cutler & Pickering
399 Park Avenue
New York, NY 10022
(*Co-Counsel for Verizon Communications Inc.*)

Joel Millar, Esq.
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, DC 20037-1420
(*Co-Counsel for Verizon Communications Inc.*)

Mark W. Powers, Esq.
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
(*Co-Counsel for Verizon Communications Inc.*)

Advanta Business Card
P.O. Box 8088
Philadelphia, PA 19101-8088

Cisco Systems Capital Co.
5500 Wayzatta Boulevard
Suite 725
Golden Valley, MN 55416-1244

Delcampo Art
160 Tynsboro Road
North Chelmsford, MA 01863

Direct Capital Corp.
P.O. Box 4382
Portsmouth, NH 03802-9871

Epstein, Becker & Green
111 Huntington Avenue
Boston, MA 02199

Fleet Credit Card Service
P.O. Box 15368
Wilmington, DE 19886-5368

{J:\CLIENTS\ban\303402\0001\00497434.DOC;1}

GE Corp. Plus
P.O. Box 410420
Salt Lake City, UT  84141-0420

Infohighway Communication
A.R.C. Networks, Inc.
P.O. Box 27119
New York, NY  10087-7119

Mackinnon Printing
Six Ledge Rock Way
P.O. Box 2035
Acton, MA  01720

Massachusetts Business Association
135 Wood Road
Braintree, MA  02184

MBNA America
P.O. Box 15019
Wilmington, DE  19886-5019

Meganet Communications
315 Pleasant Street
Fall River, MA  02721

Northeast Copier & Fax
344 Newton Drive
Nashua, NH  03063

Paradyne Finance Corp.
P.O. Box 930224
Atlanta, GA  31193-0224

Platinum Plus For Business
P.O. Box 15469
Wilmington, DE  19886-5469

Riverstone Marketing Sol.
32 Wright Road
Ayer, MA  01432-1571

The Lowell Sun
15 Kearney Square
P.O. Box 1477
Lowell, MA  01853

Verizon (2)
P.O. Box 15150
Worcester, MA  01615-0150

{J:\CLIENTS\ban\303402\0001\00497434.DOC;1}

Verizon (3)
P.O. Box 15071
Albany, NY  12212

Mr. Ira Kleiner
8h Highpine Avenue
Nashua, NH  03063

Neil Herskowitz
Riverside Contracting LLC
P.O. Box 626, Planetarium Station
New York, NY  10024-0540

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### Proceeding Memorandum/Order

In Re: Prospeed.Net, Inc.

Case Number 03-44857    (JBR)

Chapter 11

#57  Motion to Approve Disclosure Statement of Prospeed.net, Inc. Dated 6/10/04 and #62 Objection of the Operating Telephone Company
Timothy M. Mauser for Debtors
Mark W. Powers for the Operating Telephone Company

## COURT ACTION:

Show Cause Order
_____ Granted
_____ Denied
_____ Withdrawn in Open Court
_____ Sustained
_____ Continued to _____
_____ Proposed Order to be Submitted by _____
_____ Stipulation to be Submitted by _____
_____ Taken Under Advisement

_____ Released
_____ Approved
_____ Denied Without Prejudice

_____ Overruled

_____ Enforced
_____ Moot

## DECISION SET OUT MORE FULLY BY COURT AS FOLLOWS:

For the reasons set forth on the record at the hearing on September 9, 2004 (Transcript in Docket #75), the Court accepts the analysis and reasoning of Verizon as set forth in Memo of Law (Docket #66) and denies approval of Debtor's Disclosure Statement.

SO ORDERED:

*Joel B. Rosenthal*

Joel B. Rosenthal
United States Bankruptcy Judge

Dated 12/10/2004

# **EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE:<br>PROSPEED.NET, INC.<br>DEBTOR | ) ) ) ) ) | CASE NO.03-44857 JBR<br>CHAPTER 11 |

DISCLOSURE STATEMENT  TO THE PLAN OF
REORGANIZATION OF PROSPEED.NET, INC.
JUNE 10, 2004

ARTICLE I

A. Status

On August 19, 2003 Prospeed.Net, Inc.. (hereinafter referred to as the "Company" or the "Debtor"), filed a voluntary petition for relief under Chapter 11 pursuant to Title 11, United States Code, §101-1330, known as the Bankruptcy Code (hereinafter referred to as the "Code"), in the United States Bankruptcy Court for the District of Massachusetts, Eastern Division in Boston, Massachusetts (the "Bankruptcy Court").  In general, a company seeking to reorganize under Chapter 11 of the Code must propose a plan of reorganization to its creditors.  Before a plan of reorganization may be implemented, it must be confirmed by the Bankruptcy Court, the requirements for which include that each class of creditors accept the proposed plan and that the plan of reorganization be feasible.

Since the filing of its Chapter 11 petition, the Debtor has remained in possession and in control of its business and has conducted its business operations as a debtor in possession.

B. Description of Business

Prospeed.Net is a Competitive Local Exchange Carrier (CLEC) certified to operate in the states of Massachusetts and New Hampshire. Prospeed.Net is a facilities based (own its own network hardware) Internet Service Provider (ISP) operating high-speed communication Network using Digital Subscriber Line (DSL) technology. DSL technology transforms the existing copper phone lines connecting millions of homes and businesses to the global communications network into high-capacity data pipes capable of supporting broadband Internet applications.

The company provides high speed internet access, network integration and other service production and hardware to under served rural and small suburban Massachusetts communities. Specifically Prospeed.Net is focused on marketing its services to cities with very limited or no broadband internet service. These are specifically towns which Incumbent Local Exchange Carrier (ILEC), in this case Verizon, finds uneconomical to service.

Prospeed.Net offers DSL service to both business and commercial customers utilizing Verizon existing copper wire network. This is accomplished by co-locating facilities in the Verizon Central Office (CO). Note, this accommodation is mandated by the Federal Communication Act of 1998. The equipment in this location is interconnected to a network operations center (NOC) operated by Prospeed.Net as well as directly to the customer and the internet via a third party service provider.

In addition, the company provides a growing suite of network-enabled features and applications to extend the functionality of corporate communications and networking resources for remote offices and workers. We also offer high performance Internet access solutions to remote offices and workers, E-mail and web hosting. Value added VPN and Network integration services in Prospeed.Net the best

2

choice for all companies and home residential users.

The Company is serving Westford, Ma; Lowell, Ma; Tyngsboro, Ma, and parts of North Chelmsford, Dracut, North Andover, and Billerica, Ma. The company's plans call for two additional cities to be opened by year end.

The Debtor is a Massachusetts corporation which was established in 1999. The Debtor is a non-publicly held corportation.

The Debtor's principal offices are presently located 164 Westford Street, Tyngsboro, Massachusets. The Debtor's business premises is leased from an unrelated party.

The Company currently has 4 full time employees, and utilizes casual labor on an as needed basis. The Debtor's business premises is leased from an unrelated party.

While the Company's initial operations were not profitable, however since Christopher Golden became the Company's President the Debtor has historically operated profitably. The Company believes that it can generate sales at a level which will allow it to generate sufficient funds from operations to allow it to fund the Chapter 11 Plan of Reorganization (hereinafter referred to as the "Plan") proposed herein. Further, the Debtor believes that its long term prospects have been enhanced given that the Chapter 11 filing, does not appear to have affected the Debtor's ability to attract new customers, as is evidenced by the results of operation during the Chapter 11 Case.

C.  Purpose of Disclosure Statement

This Disclosure Statement is submitted pursuant to Section 1125 of the United States Bankruptcy Code for the purpose of providing creditors of the Debtor with adequate information concerning the Debtor and the Plan to enable the Creditors to make an informed decision in exercising their right to

vote whether to accept or reject the Plan.  Further, since the Plan contemplates certain payments to be made by the Debtor, this Disclosure Statement is also intended to provide holders of claims against the Debtor with adequate information about the Debtor, to make an informed judgment about the merits of approving the Plan.  Capitalized terms used in this Disclosure Statement shall have the meaning assigned to them in the Plan.  Terms used herein that are defined in Section 101 of the Code shall have the meaning assigned to them in that Section.

D.  Disclaimers

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  NO REPRESENTATION CONCERNING THE DEBTOR, INCLUDING THOSE RELATING TO ITS FUTURE BUSINESS OPERATIONS, OR THE VALUE OF ASSETS, ANY PROPERTY, AND CREDITORS' CLAIMS INCONSISTENT WITH ANYTHING CONTAINED HEREIN HAVE BEEN AUTHORIZED.  ANY REPRESENTATION OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.  NEITHER THE DEBTOR NOR ITS REPRESENTATIVES WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE OR WITHOUT OMISSIONS.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION BY THE BANKRUPTCY COURT FOR OR AGAINST ANY FILED PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN IT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS.

THE STATEMENTS CONTAINED IN HEREIN  ARE MADE AS OF THIS DATE UNLESS ANOTHER TIME IS SPECIFIED, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT

E. Attachments to Disclosure Statement

Accompanying this Disclosure Statement are copies of:

1.      The Plan of Reorganization, annexed as Exhibit 1;

2.      Liquidation Analysis, annexed as Exhibit 2;

3.      Statement of Financial Operations; annexed as Exhibit 3;

4.      Release and Settlement Agreement; annexed as Exhibit 4.

5.      Order of the Court approving this Disclosure Statement; annexed as Exhibit 5; and

6.      Ballot to accept or reject the Plan of Reorganization; annexed as Exhibit 6.

F. Persons Entitled to Vote on Plan

Holders of impaired claims may vote to accept or reject the Plan. A claim is generally deemed impaired under Section 1124 of the Code when under the Plan of Reorganization it does not retain its full contractual and legal rights.

G. Voting Procedure

After carefully reviewing the Plan, including all attachments thereto, and this Disclosure Statement and its exhibits, please indicate your vote on the enclosed ballot. Completed ballots must be sent to counsel for the Debtor, Timothy M. Mauser Esq., Mauser & Mauser, 180 Canal Street, Suite 400, Boston, Massachusetts 02114 by the date indicated in the order approving this Disclosure Statement.

## ARTICLE II
## VOTING AND CONFIRMATION

A.   General Requirements

In order to confirm the Plan, the Code requires that the Bankruptcy Court make a series of

determinations concerning the Plan, including that (1) the Plan has classified Claims in a permissible

manner; (2) the Plan complies with the technical requirements of Chapter 11 of the Code; (3) the

proponent of the Plan has proposed the Plan in good faith; (4) the disclosures concerning the Plan as

required by Chapter 11 of the Code have been adequate and have included information concerning all

payments made or promised by the Debtor in connection with the Plan; (5) the Plan has been accepted

by the requisite votes of creditors;  (6) the Plan is "feasible", meaning there is a reasonable prospect that

the Debtor will be able to perform its obligations under the Plan and continue to operate its business

without further financial reorganization, and (7) the Plan is in the best interest of all creditors, meaning

that creditors will receive pursuant to the Plan more than they would receive in a Chapter 7 liquidation.

To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met.  Thus,

even if the creditors of the Debtor accept the Plan by the requisite votes, the Court must make

independent findings respecting the Plan's feasibility and whether it is in the best interest of the Debtor's

creditors before it may confirm the Plan.  The Debtor believes that the Plan fulfills all of the statutory

conditions of Section 1129 of the Code.  These statutory conditions to confirmation are more fully

discussed below.

6

B.  Classification of Claims and Interests

The Code requires that a Plan of Reorganization place each creditor's claim in a class with other claims which are substantially similar.  The Debtor believes that the Plan meets the classification requirements of the Code.

C.  Voting

As a condition to Confirmation, the Code requires that each impaired class of Claims accept the Plan.  The Code defines acceptance of a Plan by a class of Claims as acceptance by holders of two-thirds in dollar amount and a majority in number of claims of that class, but for that purpose the only ballots counted are those of Creditors who actually vote to accept or to reject the Plan and are allowed to vote.  Holders of claims who fail to vote are not counted as either accepting or rejecting the Plan.

Classes of claims that are not impaired under the Plan are deemed to have accepted the Plan.  In this case, the Unsecured Creditor Class must accept the Plan.  Acceptances of the Plan are being solicited only from those persons who hold Allowed Claims that are impaired under the Plan.  An Allowed Claim is impaired if the legal, equitable or contractual rights attaching to the Allowed Claims of the class are modified, other than by curing defaults and reinstating maturity or by payment in full in cash.

D.  Best Interest of Creditors

Notwithstanding acceptance of the Plan as provided for in the Code by creditors of each class, in order to confirm the Plan the Bankruptcy Court must independently determine that the Plan is in the best interest of all classes of creditors impaired by the Plan.  The best interest test requires that the

7

Bankruptcy Court find that the Plan provides to each member of each impaired class of claims a recovery which has a value at least equal to the value of the distribution which each such person would receive if the Debtor were liquidated under Chapter 7 of the Code.

ARTICLE III
INFORMATION PERTAINING TO DEBTOR

A.  Incorporation and Ownership

The Debtor, Prospeed.Net, Inc., is a Massachusetts corporation which was established in 1999. The Company , is a non-public closely held corporation..

B.  Business of Debtor

Prospeed.Net is a Competitive Local Exchange Carrier (CLEC) certified to operate in the states of Massachusetts and New Hampshire.  Prospeed.Net is a facilities based (own its own network hardware) Internet Service Provider (ISP) operating high-speed communication Network using Digital Subscriber Line (DSL) technology.  DSL technology transforms the existing copper phone lines connecting millions of homes and businesses to the global communications network into high-capacity data pipes capable of supporting broadband Internet applications.

The company provides high speed internet access,  network integration and other service production and hardware to under served rural and small suburban Massachusetts communities. Specifically Prospeed.Net is focused on marketing its services to cities with very limited or no broadband internet service.  These are specifically towns which Incumbent Local Exchange Carrier (ILEC), in this case Verizon, finds uneconomical to service.

8

Prospeed.Net offers DSL service to both business and commercial customers utilizing Verizon existing copper wire network. This is accomplished by co-locating facilities in the Verizon Central Office (CO). Note, this accommodation is mandated by the Federal Communication Act of 1998. The equipment in this location is interconnected to a network operations center (NOC) operated by Prospeed.Net as well as directly to the customer and the internet via a third party service provider.

In addition, the company provides a growing suite of network-enabled features and applications to extend the functionality of corporate communications and networking resources for remote offices and workers. We also offer high performance Internet access solutions to remote offices and workers, E-mail and web hosting. Value added VPN and Network integration services in Prospeed.Net the best choice for all companies and home residential users.

The Company is serving Westford, Ma; Lowell, Ma; Tyngsboro, Ma, and parts of North Chelmsford, Dracut, North Andover, and Billerica, Ma. The company's plans call for two additional cities to be opened by year end.

The Debtor realized a gross income of $492,780.00 and $749,929.00 in 2001 and 2002 , and sustained losses of - $51,272.00 and -$172,064.00. Since the Chapter 11 filing in August of 2003 the Debtor has realized gross income through April, 2004 of $ 534,000.00 and recognized income before taxes of approximately $ 45,000.00 for the same period . The Debtor anticipated that its total revenue for the year ending December 31, 2002 will exceed $ 800,000.00 with pre-tax income in excess $ 70,000.00. Thereafter, the Debtor expects that its gross income will generally increase at the rate of 5 percent per annum. See Financial Projections.

9

The Company's President Christopher Golden, manages the Company's day to day operations. Currently, the Debtor has over four full time employees, and utilizes technical labor on an as needed basis.

C. Past Financial Problems

The immediate cause of the Company's filing for the protection afforded by Title 11 of the United States Bankruptcy Code was the threatened suspension of service provided by Verizon in August of 2003. Despite operating on a profitable basis in 2003 through July 2003, the Debtor was unable to meet Verizion's demand for full payment of their disputed debt. At the time of filing Verizon claimed it was owed in excess of $400,000.00.

Since, the filing Verizon has issued large credits against its initial claim, leaving a current claim of $228,000.00. However, the Debtor believes it is owed additional credits amounting to $ 177,000.00, from service disputes and non-reversed late charges on improperly billed services which were subsequently credited. As a result the Debtor believes it owes Verizon $55,000.00 for pre-petition claims.


D. Post-Petition Changes and Operations

The Debtor has taken the opportunity provided by the Automatic Stay of the Bankruptcy Code to redouble its efforts to provide expand its existing client and service area. Further, the Debtor has operated profitably since the filing of the petition and has maintained its principal service providers, Verizon and AT&T, on a current basis and all other bills on a current basis. It is Mr. Golden's goal to cautiously expand the company over time.

Specifically, the initial results of operation in the post Chapter 11 filing period have been favorable, as operating revenues have reached the level of $ 534,000.00, for the eight months ending April 30, 2004 with income before taxes for the period of approximately $45,000.00. See Financial Statements.. Currently, the Debtor's operations are profitable and Mr. Golden the Company's President believes that current net operating revenue will be sufficient to fund the proposed Chapter 11 Plan of Reorganization.

Since the filing of this bankruptcy case, the Debtor has paid all vendors, and Federal and Massachusetts taxes due on a timely basis.

E. Post-petition Cash Flow

To date, the Debtor has operated profitably and has improved its working capital position while in Chapter 11. The Debtor enjoyed a profitable 2003 year as well with respect to its operations and expects its net income to grow at the rate of approximately 5% per annum hereafter. The Debtor expects 2004 gross revenues to approximate $ 800,000.00 with income before taxes of $70,000.00.

At this point in time, the Debtor believes that its cash flow will continue to improve and that it will realize sufficient net operating income over the term of the Plan of Reorganization to meet the Plan Payments described in the Plan of Reorganization. See the Financial Statements attached as Exhibit 3.

At the start of this Chapter 11 case, the Debtor had a beginning cash position of approximately $11,000.00 and receivables of approximately $46,000.00. As of June 10, 2004 the Debtor had total cash on hand of approximately $ 33,000.00, and gross receivables of approximately $ 52,000.00.

11

F. AT&T Settlement

At the start of the Bankruptcy Case AT&T Corp. ("AT&T") had a claim against the Debtor for

$ 297,171.88 which the Debtor disputed.  During the course of the Bankruptcy, AT&T agreed to

waive its claim in full without any future payment or obligation on the Debtor's part, other than payment

on normally billed future service.  A copy of the Release and Settlement Agreement is attached hereto

as Exhibit 4.

G. Payments to Insiders

The Company employs two (2) insiders,  Mr.Christopher Golden is the Company's President and

general manager and has an annual salary of approximately 50,000.00 and Mr. Collin King director of

marketing  who has an annual salary of $70,000.00.

## ARTICLE IV
### DESCRIPTION OF PLAN

THE FOLLOWING IS A SUMMARY OF THE SIGNIFICANT ELEMENTS OF THE

PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY

REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND

THE ATTACHMENTS THERETO.

A. Designation of Classes of Claims

1.   Class I consists of Allowed Administrative Claims which are estimated to total

approximately $ 25,000.00 as of the date of this Disclosure Statement. The amount

consists entirely of professional fees payable to Court approved counsel, Mauser &

Mauser. The Plan contemplates paying the foregoing professionals in full on the Plan

Confirmation Date as follows:

   Court Approved Debtor's Counsel  $ 25,000.00


The foregoing payment is subject to the approval of the Bankruptcy Court prior to

payment. The amount shown as payable to the Debtor's counsel does not reflect the

$10,830.00 retainer previously paid to Debtor's counsel.

2.   Class II consists of the secured claim of Marlin Leasing , secured by computer equipment,

in the amount of $1,162.00. Marlin has offered to settle the claim for $500.00 and turn

title over to the Debtor. This class is impaired.

3.   Class III consists of the secured claim on a lease of Sunrise International Leasing

Corporation d/b/a/ Sunrise Leasing Corporation d/b/a Cisco Systems Capital

Corporation, secured by computer equipment. The Debtor believes that this is a capital

lease and that the lease has expired. The Debtor will return this equipment to Cisco on

request or in return for title to the equipment the Debtor will pay to Sunrise $3,000.00.

This class is impaired.

4.    Class VI consists of Priority Claims payable to the Massachusetts Department of Revenue in the amount of $ 4,916.56, for employment taxes and corporate excise taxes. The Debtor does not owe pre-petition or post-petition taxes to the Internal Revenue Service, nor post-petition taxes to the Massachusetts Department of Revenue. This Class is impaired

5.    Class V consists of the claims of general unsecured creditors, trade creditors and any unclassified claims against the Debtor. As of this date, the Debtor has identified unsecured claims which it believe will be allowed totaling $ 275,000.00, including $228,000.00 claimed by Verizon, which will be offered a dividend under the Plan of Reorganization of twenty (20%) percent.

6.    Class VI consists of the claims of the Debtor's equity holders. The current stock holder No. will retain their equity interest in the Debtor.

### B. Treatment of Allowed Administrative Claims

Allowed Administrative Claims (designated as Class I Claims) shall be paid in cash, in full, on the latter of the Plan Confirmation Date or the date they are allowed by an Order of the Bankruptcy Court. The payments contemplated by the Plan shall constitute full satisfaction of allowed Administrative Claims. Administrative Claims include any post-petition, unpaid bills or charges incurred in the ordinary course of business and the fees and expenses allowed to professionals employed upon Court authority to render services to the Debtor during the course of the Chapter 11 case.

The professionals engaged during the pendency of this bankruptcy case are Mauser & Mauser, counsel for the Debtor. Fees incurred by the Debtor subsequent to the filing of the Debtor's Chapter 11 petition are administrative claims payable by the Debtor pursuant to its Plan of Reorganization.

The Debtor has, in the ordinary course of its business, not incurred trade debt as of the date of the Disclosure Statement beyond its normal operating requirements. Any trade debt of the Debtor is for normal inventory purchases and is paid in accordance with normal terms. All such debt is current. As the Debtor contemplates full payment of all debt of this type within thirty days of receipt, no special provision is made for the payment of this debt in the Debtor's Plan of Reorganization.

The Debtor has not incurred any post petition debt to taxing authorities which could be considered an administrative claim. As of the date of this Disclosure Statement, the Debtor has filed all state and federal tax returns and reports due.

In order to be compensated, all professionals related to this case must apply to the Bankruptcy Court for compensation and will be paid that amount which the Bankruptcy Court allows. This Disclosure Statement was prepared and submitted at a point anticipated to be approximately sixty days prior to the date proposed for Confirmation and more work by the Debtor's counsel and accountant may be rendered to the Debtor. Nonetheless, Debtor's counsel does not expect total professional fees and costs to exceed $ 25,000.00 at this time.

Normally, fees for professional persons awarded under Section 330 of the Bankruptcy Code, which constitute administrative expenses entitled to priority, would be paid in full after confirmation, unless other arrangements are made between the claimant and the Debtor.

15

The Debtor estimates that the court may allow total compensation of professionals of approximately $25,000.00 for fees and expenses for services in this Chapter 11 case, which would normally be paid in full upon confirmation of this case. Debtor's Counsel's total fees and expenses are estimated to be approximately $25,000.00, of which $10,830.00 has been received as a retainer.

## C.  Treatment of Secured Claims

The Claim in Class II consists of the claim of Marlin Leasing which is secured by computer equipment of $1,162.00.  Marlin has offered to settle the claim for $500.00 and turn title over to the Debtor.  The Debtor intends to accept this offer to purchase the equipment.

Class III consists of the secured claim on a lease of Sunrise International Leasing Corporation d/b/a/ Sunrise Leasing Corporation d/b/a Cisco Systems Capital Corporation, secured by computer equipment.   The Debtor believes that this is a capital lease and that the lease has expired.  The Debtor will return this equipment to Sunrise on request or in return for title to the equipment the Debtor will pay to Sunrise $3,000.00.

## D.  Treatment of Priority Tax Claims

This class is impaired. Claims in Class III consist of Priority Taxes payable to the Commonwealth of Massachusetts (designated as Class III Claims) in the amount of $ 4,916.56 and will be paid in full over the Plan term by quarterly payments over thirty-six months.

## E.  Treatment of Allowed Unsecured Claims

Claims in Class V consist of allowed unsecured claims which are generally owed to trade creditors and other unsecured creditors.  A total of $275,000.00 in allowable unsecured general claims have

16

been scheduled in the Debtor's Bankruptcy Petition or otherwise identified pursuant to filed proof of claims. The Debtor may object to the claim of Verizon in this class. The Debtor proposes to pay the allowed unsecured general claims a dividend of twenty percent (20%) of the allowed amount in equal consecutive quarterly payments for a term of three (3) years from the date of confirmation without interest. The total dividend paid to Class IV is expected to be $55,000.00 and each such quarterly payment shall be in the amount of $6,112.00. In the event the total to be received by an unsecured claimant is under $100.00 the Debtor shall make a single payment to resolve the claim with the initial Plan Payment. In the unlikely event that allowed unsecured Class V Claims exceed $275,000.00 the Debtor's obligations shall be capped at $55,000.00 and allowed Class V Claims will share the resulting dividend pro-rata.

F.  Treatment of Stockholder Equity

Class VI consists of the claims of the Debtor's equity holders. The current stock holders will retain their equity interest in the Debtor.

G.  Disbursements

The Debtor will serve as distribution agent of all payments so made. The distribution for Class I, Class II and Class III Claims will be made thirty (30) days from the Confirmation Date of this Plan of Reorganization.

The first distributions to Class IV and Class V claimants will commence thirty (30) days from the Confirmation Date of this Plan of Reorganization and be paid on the quarterly or annual anniversary date thereafter.

17

The Plan is premised upon the Debtor's belief that the unsecured creditors will receive a greater percentage of their claims under the Plan than it would upon a forced liquidation of the business under Chapter 7 of the Bankruptcy Code. See Exhibit 2, Liquidation Analysis.

H.  Retention of Control

The Plan provides that the Class VI Claim holders, shall retain their shareholder interest and will remain in control of the Debtor.

I.  Plan Funding and Working Capital

It is anticipated that the Debtor will have sufficient cash on hand from operations to make the initial plan payments including administrative claims payable to Class I.

Thereafter, it is expected that the Debtor will realize sufficient net operating revenue to fund the required Plan of Reorganization payments. See Exhibit 3, Statement of Financial Operations. As of June 10, 2004, the Debtor had cash reserves of $ 33,000.00 and projects that it will have sufficient funds on hand from operations to fund the Plan and meet the Debtor's projected cash flow needs.

J.  Provisions Concerning the Execution of the Plan

On Confirmation, all property of the estate shall be retained by the Debtor, free and clear of all claims, liens and encumbrances other than those described herein.. Further, all other interests in the Debtor shall be retained by the holders thereof, free and clear of any claims, liens and encumbrances.

K.  Retention of Jurisdiction

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Case for the following limited purposes:

18

1. To take any action to resolve any disputes arising out of or relating to any Claim; to determine other issues presented by or arising under the plan, and to take any action to resolve any disputes of creditors with respect to their Claims;

2. To construe and to take any action to enforce the Plan, issue such orders as may be necessary for the implementation, execution and consummation of the Plan, and determine all other matters which may be pending on the Confirmation Date;

3. To determine any and all applications pending on the Confirmation Date or thereafter for the rejection, assumption or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

4. To determine all applications, adversary proceedings, contested matters and other litigated matters pending on the Effective Date;

5. To determine such other matters and for such other purposes as may be provided in the Confirmation Order; and

6. To modify the Plan but only in accordance with the Plan or to remedy any apparent non-material defect or omission in the Plan, or to reconcile any non-material inconsistency in the Plan so as to carry out its intent and purposes.

The Effective Date shall be thirty (30) days after confirmation, or at the conclusion of all appeals from an order confirming this Plan.

L.. Means for Implementation of the Plan

. The Debtor will serve as disbursing agent of all payments to be made under the Plan as described in Sections B through E above.

On the Plan Confirmation Date, the Debtor anticipates disbursing approximately $15,000.00 to pay allowed administrative claims. The Debtor will commence, thirty days after the Plan Confirmation Date, making the Plan installment payments. The initial installment payments include a one time payment of $500.00 and $3,000.00 respectively to Class II and Class III Secured Claims, initial quarterly payment to Priority Tax Claims of $410.00, and $ 6,112.00 to Class V Unsecured Claims, all totaling $10,022.00. Thereafter, the Class IV and Class V Claimants will receive quarterly payments.

As of the date of Plan confirmation, the Debtor expects to have at least $35,000.00 on hand to be used for working capital purposes, administrative claims, the initial installment on the priority tax claim and the first monthly payment to general unsecured creditor. Note, as of June 10, 2004, the Debtor had $ 33,000.00 on hand.

M. Provision for Disputed Claims:

The Debtor may object to the allowance of any Claim within 30 days of the Effective Date, by filing an objection with the Bankruptcy Court and serving a copy thereof on the holder of the Claim, in which event the Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by allowance of the Claim in whole or in part, the Company will make any payments in respect of such Allowed Claim in accordance with and limited by the Plan.

N. Administrative Expenses and Other Post Petition Claims

All unsecured obligations incurred by the Debtor in the ordinary course of business in the Chapter 11 case, other than amounts allowed to professionals, which may be due as of the date of confirmation and entitled to first priority under the Bankruptcy Code, shall be paid in full at the time of Confirmation.

ARTICLE V
LIQUIDATION VALUATION

To calculate what the unsecured creditors would receive if the Debtor were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if the Chapter 11 case were converted to a Chapter 7 case under the Code and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the assets of the Debtor. Since the assets of the Debtor have been valued at less than $ 60,500.00 for liquidation purposes, after subtracting the net realizable value of the Administrative, Secured and Priority Claims as set forth in Exhibit "2" attached hereto, nothing would remain to be paid to unsecured creditors.

The Plan of Reorganization contemplates paying the Administrative Claim, and Priority Tax Claims in full, as well as resolving the Class II and Class III Secured Claims and provide a dividend to the unsecured claims of Class V. The Debtor believes it can afford to pay a 20% dividend to the Class V general unsecured claims. As the Debtor believes that allowable Class V unsecured claims will total an estimated $ 275,000.00, and the Chapter 11 Plan of Reorganization proposes a Plan dividend payment of 20% or $ 55,000.00 to unsecured general creditors over three years; it is clear that the unsecured creditors will do better under Chapter 11 than under a Chapter 7 liquidation. Further, any amount of Liquidation Value available could be diminished by the costs and expenses of the liquidation, as well as other administrative expenses that would be incurred by the Debtor's hypothetical Chapter 7 estate.

21

The Debtor's costs of liquidation under Chapter 7 would include the compensation of Chapter 7 Bankruptcy Trustee, as well as of counsel and of other professionals retained by the trustee. All unpaid expenses incurred by the Debtor during its Chapter 11 case (such as compensation for attorneys, financial advisors and accountants) which are allowed in the Chapter 7 proceeding, together with litigation costs and claims arising from the operation of the Debtor during the pendency of the Chapter 11 reorganization and Chapter 7 liquidation cases would be entitled to priority over the unsecured creditors. Were the Debtor to cease operations with uncompleted construction projects, damage claims and warranty claims arising from the Debtor's breach of post petition contracts would arise, the damages resulting from these claims would in all likelihood be material. These claims would be treated at Administrative Claims and must be paid in full out of the liquidation proceeds before any sums would be available to pay general unsecured pre-petition claims.

The Debtor believes that the Plan is in the best interests of all creditors. Thus, a conversion to Chapter 7 with the additional costs noted above would provide no greater return to unsecured creditors than the Plan would provide.

## ARTICLE VI
## FEASIBILITY

The Bankruptcy Code requires as a condition to Confirmation that the Bankruptcy Court find that liquidation of the debtor or the need for further reorganization is not likely to follow after Confirmation. The Plan's distributions to creditors depend upon the Debtor's future operations, which the Debtor believes will yield a positive cash flow sufficient to fund this Plan.

22

The Plan requires the payment upon the Effective date of approximately $ 15,000.00 to Debtor's legal counsel, subject to the approval of the Bankruptcy Court.

The Plan requires that the Debtor disburse via quarterly payments of $19,972.00 annually for each of the three years of the Plan. The Debtor's principal believe that Operations will provide sufficient cash flow to allow all subsequent Plan payments.

## ARTICLE VII
### DEBTOR'S OPERATION AS A DEBTOR IN POSSESSION

Since the filing of the Chapter 11 Petition, the Debtor has been able to operate profitably. The Debtor's principal believes that projected operating revenue for 2004 and thereafter will be sufficient to meet the proposed Plan Payments.

During the pendency of this case, the Debtor has operated profitably and at this point, the Debtor believes that it will have sufficient funds available from operations to fund both normal operating expenses and its Plan payments to pre-petition creditors.

## ARTICLE VIII
### CONCLUSION

The Debtor respectfully suggests that the proposed Plan of Reorganization is feasible and in the best interest of each class of creditors. The Plan is the result of effort by the Debtor to provide creditors with a meaningful dividend and in fact, the Debtor's operations have allowed it to propose a Twenty (20 %) dividend to the Class V Unsecured Creditor claims after full payment of a secured and

23

priority tax obligations. The only alternative to the proposed Plan of Reorganization is liquidation of the

Debtor which the Debtor believes would eliminate a large portion of the dividend to Class V Claim

Holders. Therefore, the Debtor believes that the proposed Plan is clearly preferable to liquidation.


A BALLOT IS ENCLOSE HEREWITH, YOU SHOULD VOTE TO ACCEPT OR REJECT THE PLAN UPON THAT BALLOT AND RETURN IT TO TIMOTHY M. MAUSER, MAUSER & MAUSER, 180 CANAL STREET, SUITE 400, BOSTON, MASSACHUSETTS 02114.


Respectfully submitted,
Prospeed.Net, Inc.
By its attorney,


Timothy M. Mauser
Mauser & Mauser
180 Canal Street, Suite 400
Boston, MA  02114
(617) 720-5585 (Telephone)
(617) 720-5553 (Facsimile)
BBO# 542050

Dated: June 10, 2004
2202.10.wpd

24

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| IN RE:<br>PROSPEED.NET, INC.<br><br>DEBTOR | CASE NO.03-44857 JBR<br>CHAPTER 11 |

## PLAN OF REORGANIZATION
### JUNE 10, 2004

Prospeed.net, Inc. (the "Debtor"), proposes the following Plan of Reorganization pursuant to

Chapter 11 of the Bankruptcy Code, Section 1121 (a):

### ARTICLE I
### DEFINITIONS

"Code" shall mean the Bankruptcy Reform Act of 1978 as modified in Title 11, United States

Code.

"Confirmation Date" shall mean the date on which the Plan is confirmed by Order of the Court.

"Court" shall mean the United States Bankruptcy Court for the Eastern Division of Massachusetts.

"Debtor" shall mean Prospeed.net, Inc..

"Effective Date" is herein defined as thirty (30) days from the date upon which the Order of

Confirmation of this plan or any amended plan of reorganization filed by the Debtor is entered by the

Court assuming that no appeal from said Order of Confirmation is filed.  If there is an appeal from the

Order of Confirmation, the Effective Date will be thirty (30) days after the date on which all appeals

1

have been withdrawn, dismissed or otherwise completed, or thirty (30) days after any such order

becomes dispositive of said appeal and confirming a plan of the Debtor becomes final and subject to no

further appeal.

"Plan" shall mean this Plan of Reorganization.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

All claims, as defined under Section 101(4) of the Code and all interests in equity securities as

defined in Section 101(15) of the Code, of whatever nature, whether scheduled or not scheduled,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

secured or unsecured, shall be bound by the provisions of this plan and are hereby classified as follows:

1.   Class I consists of Allowed Administrative Claims which are estimated to total

approximately $ 25,000.00 as of the date of this Disclosure Statement. The amount

consists entirely of professional fees payable to Court approved counsel, Mauser &

Mauser. The Plan contemplates paying the foregoing professional in full on the Plan

Confirmation Date as follows:

Court Approved Debtor's Counsel          $ 25,000.00

The foregoing payments are each subject to the approval of the Bankruptcy Court prior to

payment. The amount shown as payable to the Debtor's counsel does not reflect the

$10,830.00 retainer previously paid to Debtor's counsel.

2.   Class II consists of the secured claim of Marlin Leasing , secured by computer equipment,

in the amount of $1,162.00. Marlin has offered to settle the claim for $500.00 and turn

2

title over to the Debtor. This class is impaired.

3.    Class III consists of the secured claim on a lease of Sunrise International Leasing

Corporation d/b/a/ Sunrise Leasing Corporation d/b/a Cisco Systems Capital

Corporation, secured by computer equipment. The Debtor believes that this is a capital

lease and that the lease has expired. The Debtor will return this equipment to Cisco on

request or in return for title to the equipment the Debtor will pay to Sunrise $3,000.00.

This class is impaired.

4.    Class VI consists of Priority Claims payable to the Massachusetts Department of Revenue

in the amount of $ 4,916.56, for employment taxes and corporate excise taxes. The

Debtor does not owe pre-petition or post-petition taxes to the Internal Revenue Service,

nor post-petition taxes to the Massachusetts Department of Revenue. This Class is

impaired

5.    Class V consists of the claims of general unsecured creditors, trade creditors and any

unclassified claims against the Debtor. As of this date, the Debtor has identified unsecured

claims which it believe will be allowed totaling $ 275,000.00, including $228,000.00

claimed by Verizon, which will be offered a dividend under the Plan of Reorganization of

twenty (20%) percent.

6.    Class VI consists of the claims of the Debtor's equity holders. The current stock holder

will retain their equity interest in the Debtor.

3

## ARTICLE III
## ADMINISTRATIVE EXPENSES UNDER SECTION 507 (a)(1)

Allowed Administrative Claims (designated as Class I Claims) shall be paid in cash, in full, on the latter of the Plan Confirmation Date or the date they are allowed by an Order of the Bankruptcy Court. The payments contemplated by the Plan shall constitute full satisfaction of allowed Administrative Claims. Administrative Claims include any post-petition, unpaid bills or charges incurred in the ordinary course of business and the fees and expenses allowed to professionals employed upon Court authority to render services to the Debtor during the course of the Chapter 11 case.

The professionals engaged during the pendency of this bankruptcy case are Mauser & Mauser, counsel for the Debtor. Fees incurred by the Debtor subsequent to the filing of the Debtor's Chapter 11 petition are administrative claims payable by the Debtor pursuant to its Plan of Reorganization.

The Debtor has, in the ordinary course of its business, not incurred trade debt as of the date of the Disclosure Statement beyond its normal operating requirements. Any trade debt of the Debtor is for normal inventory purchases and is paid in accordance with normal terms. All such debt is current. As the Debtor contemplates full payment of all debt of this type within thirty days of receipt, no special provision is made for the payment of this debt in the Debtor's Plan of Reorganization.

The Debtor has not incurred any post petition debt to taxing authorities which could be considered an administrative claim. As of the date of this Disclosure Statement, the Debtor has filed all state and federal tax returns and reports due.

In order to be compensated, all professionals related to this case must apply to the Bankruptcy Court for compensation and will be paid that amount which the Bankruptcy Court allows. This

4

Disclosure Statement was prepared and submitted at a point anticipated to be approximately sixty days prior to the date proposed for Confirmation and more work by the Debtor's counsel and accountant may be rendered to the Debtor. Nonetheless, Debtor's counsel does not expect total professional fees and costs to exceed $ 25,000.00 at this time.

Normally, fees for professional persons awarded under Section 330 of the Bankruptcy Code, which constitute administrative expenses entitled to priority, would be paid in full after confirmation, unless other arrangements are made between the claimant and the Debtor.

The Debtor estimates that the court may allow total compensation of professionals of approximately $25,000.00 for fees and expenses for services in this Chapter 11 case, which would normally be paid in full upon confirmation of this case. Debtor's Counsel's total fees and expenses are estimated to be approximately $25,000.00, of which $10,830.00 has been received as a retainer.

## ARTICLE IV
### SECURED  CREDITORS - CLASS II and CLASS III

The Claim in Class II consists of the claim of Marlin Leasing which is secured by computer equipment of $1,162.00. Marlin has offered to settle the claim for $500.00 and turn title over to the Debtor. The Debtor intends to accept this offer to purchase the equipment.

The Claim in Class III consists of the secured claim on a lease of Sunrise International Leasing Corporation d/b/a/ Sunrise Leasing Corporation d/b/a Cisco Systems Capital Corporation, secured by computer equipment. The Debtor believes that this is a capital lease and that the lease has expired. The Debtor will return this equipment to Sunrise on request or in return for title to the equipment the

5

Debtor will pay to Sunrise $3,000.00.

## ARTICLE IV
## PRIORITY TAX CLAIMS-CLASS IV .

This class is impaired. Claims in Class IV consist of Priority Taxes payable to the Commonwealth of Massachusetts (designated as Class IV Claims) in the amount of $ 4,916.56 and will be paid in full over the Plan term by quarterly payments over thirty-six months.

## ARTICLE V
## UNSECURED GENERAL CLAIMS - CLASS V

Claims in Class V consist of allowed unsecured claims which are generally owed to trade creditors and other unsecured creditors. A total of $275,000.00 in allowable unsecured general claims have been scheduled in the Debtor's Bankruptcy Petition or otherwise identified pursuant to filed proof of claims. The Debtor may object to the claim of Verizon in this class. The Debtor proposes to pay the allowed unsecured general claims a dividend of twenty percent (20%) of the allowed amount in equal consecutive quarterly payments for a term of three (3) years from the date of confirmation without interest. The total dividend paid to Class IV is expected to be $55,000.00 and each such quarterly payment shall be in the amount of $6,112.00. In the event the total to be received by an unsecured claimant is under $100.00 the Debtor shall make a single payment to resolve the claim with the initial Plan Payment. In the unlikely event that allowed unsecured Class V Claims exceed $275,000.00 the Debtor's obligations shall be capped at $55,000.00 and allowed Class V Claims will share the resulting dividend pro-rata.

6

<center>

ARTICLE VI
EQUITY HOLDERS- CLASS VI

</center>

Class VI consists of the claims of the Debtor's equity holders. The current stock holders will retain their equity interest in the Debtor.

<center>

ARTICLE VII
PROVISIONS CONCERNING THE EXECUTION
OF THE PLAN

</center>

The Debtor will serve as distribution agent of all payments so made. The distribution for Class I, Class II and Class III Claims will be made thirty (30) days from the Confirmation Date of this Plan of Reorganization.

The first distributions to Class IV and Class V claimants will commence thirty (30) days from the Confirmation Date of this Plan of Reorganization and be paid on the quarterly or annual anniversary date thereafter.

The Plan is premised upon the Debtor's belief that the unsecured creditors will receive a greater percentage of their claims under the Plan than it would upon a forced liquidation of the business under Chapter 7 of the Bankruptcy Code. See Exhibit 2, Liquidation Analysis. The Debtor will serve as distribution agent of all payments so made. The distribution for Class III Claims will be made thirty (30) days from the Confirmation Date of this Plan of Reorganization.

The first distributions to Class IV and Class V claimants will commence thirty (30) days from the Confirmation Date of this Plan of Reorganization and be paid on the quarterly anniversary date

<center>7</center>

thereafter.

The Plan is premised upon the Debtor's belief that the unsecured creditors will receive a greater percentage of their claims under the Plan than it would upon a forced liquidation of the business under Chapter 7 of the Bankruptcy Code. See Exhibit 2, Liquidation Analysis.

The Plan provides that holders of the Debtor's common stock shall retain their shareholder interest and will remain in control of the Debtor.

## ARTICLE VIII
## OTHER PROVISIONS CONCERNING THE EXECUTION
## OF THE PLAN

It is anticipated that the Debtor will have sufficient cash on hand from operations to make the initial plan payments including administrative claims payable to Class I.

Thereafter, it is expected that the Debtor will realize sufficient net operating revenue to fund the required Plan of Reorganization payments. See Exhibit 3, Statement of Financial Operations. As of June 10, 2004, the Debtor had cash reserves of $ 33,000.00 and projects that it will have sufficient funds on hand from operations to fund the Plan and meet the Debtor's projected cash flow needs.

## ARTICLE IX
## PROVISIONS CONCERNING THE EXECUTION
## OF THE PLAN

On Confirmation, all property of the estate shall be retained by the Debtor, free and clear of all claims, liens and encumbrances other than those described herein.. Further, all other interests in the Debtor shall be retained by the holders thereof, free and clear of any claims, liens and encumbrances.

8

## ARTICLE X
## RETENTION OF JURISDICTION

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Case for the following limited purposes:

1. To take any action to resolve any disputes arising out of or relating to any Claim; to determine other issues presented by or arising under the plan, and to take any action to resolve any disputes of creditors with respect to their Claims;

2. To construe and to take any action to enforce the Plan, issue such orders as may be necessary for the implementation, execution and consummation of the Plan, and determine all other matters which may be pending on the Confirmation Date;

3. To determine any and all applications pending on the Confirmation Date or thereafter for the rejection, assumption or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

4. To determine all applications, adversary proceedings, contested matters and other litigated matters pending on the Effective Date;

5. To determine such other matters and for such other purposes as may be provided in the Confirmation Order; and

6. To modify the Plan but only in accordance with the Plan or to remedy any apparent non-material defect or omission in the Plan, or to reconcile any non-material inconsistency in the Plan so as to carry out its intent and purposes.

The Effective Date shall be thirty (30) days after confirmation, or at the conclusion of all appeals

9

from an order confirming this Plan.

## ARTICLE XI
## MEANS FOR IMPLEMENTATION OF PLAN

On the Plan Confirmation Date, the Debtor anticipates disbursing approximately $15,000.00 to pay allowed administrative claims. The Debtor will commence, thirty days after the Plan Confirmation Date, making the Plan installment payments. The initial installment payments include a one time payment of $500.00 and $3,000.00 respectively to Class II and Class III Secured Claims, initial quarterly payment to Priority Tax Claims of $410.00, and $ 6,112.00 to Class V Unsecured Claims, all totaling $10,022.00. Thereafter, the Class IV and Class V Claimants will receive quarterly payments.

As of the date of Plan confirmation, the Debtor expects to have at least $35,000.00 on hand to be used for working capital purposes, administrative claims, the initial installment on the priority tax claim and the first monthly payment to general unsecured creditor. Note, as of June 10, 2004, the Debtor had $ 33,000.00 on hand..

## ARTICLE XII
## PROVISION FOR DISPUTED CLAIMS

The Debtor may object to the allowance of any Claim within 30 days of the Effective Date, by filing an objection with the Bankruptcy Court and serving a copy thereof on the holder of the Claim, in which event the Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by allowance of the Claim in whole or in part, the Company will

make any payments in respect of such Allowed Claim in accordance with and limited by the Plan.

<div align="center">

ARTICLE XIII

ADMINISTRATIVE EXPENSES AND OTHER POST PETITION CLAIMS

</div>

All unsecured obligations incurred by the Debtor in the ordinary course of business during this

Chapter 11 case, other than amounts allowed professionals, which may be due as of the date of

confirmation and entitled to first priority under the Bankruptcy Code, shall be paid in full at the time of

Confirmation.

Respectfully submitted,
Prospeed.Net, Inc.
By its attorney,

_____

Timothy M. Mauser
Mauser & Mauser
180 Canal Street, Suite 400
Boston, MA  02114
(617) 720-5585 (Telephone)
(617) 720-5553 (Facsimile)
BBO# 542050

Dated: June 10, 2004
2202.13.wpd

11

# PROSPEED.NET, INC.
## DISCLOSURE STATEMENT, LIQUIDATION ANALYSIS
## EXHIBIT 2

In the event that the assets of the Debtor were liquidated, as of the date of this disclosure statement, unsecured creditors ( Class V unsecured general creditors ) would receive substantially less than the 20% dividend the Debtor proposes. Class I Administrative Claims, both existing and those which would arise on liquidation, would likely receive full payment as would the Class II, Class III Secured Claims and Class IV Priority Tax Claims.  Further, the Class II and Class III secured creditors would receive their collateral which could possibly be worth less than the value of its claim, and which could further reduce the amount available to Class V unsecured general creditors. As of the date of this Disclosure Statement, the Debtor estimates that it would be subject to the following claim, before any payment to Class IV unsecured general creditors:

| | | |
|---|---|---|
| Class I | Administrative Claims - Net | $ 15,000.00 |
| Class I | Administrative Claims-Liquidation | $ 60,600.00 (1) |
| Class II | Secured Claims | $ Unknown (2) |
| Class III | Priority Tax Claims | $ 4,916.00 |
| | | |
| **Total Claims before Class V Unsecured Claims (3)** | | **$ 80,516.00** |

The current realizable asset value of the Debtor's assets assuming liquidation as of the date of this Disclosure Statement is no more than $ 60,500.00 (net of secured claims), computed as follows:

| | |
|---|---|
| Cash/Cash Equivalents | $ 33,000.00 |
| Equipment Subject to Lien | $ 0 (4) |
| Equipment not subject to liens | $ 0 (5) |
| Accounts Receivable | $ 27,500.00 (6) |
| | |
| **Total Asset Liquidation Value (as of April 30, 2004)** | **$ 60,500.00** |
| | |
| **Net Asset Liquidation Value Available to Class V** | |
| **Liquidation Value to Class V Unsecured Creditors** | **$ 0** |
| | |
| **Proposed Class V Distribution to Unsecured Creditors** | |
| **(Twenty (20%) Percent based on claims of $275,000.00)** | **$55,000.00** |

## Comparative Balance Sheets

Form OPR-1

CASE NAME:   PROSPEED.NET, INC.

CASE NUMBER: 03-44857-JBR

MONTH ENDING:   30-Apr-04

| | Month 19-Aug | Month 31-Aug | Month Sep-04 | Month Oct-04 | Month Nov-04 | Month Dec-03 | Month Jan-04 | Month Feb-04 | Month Mar-04 | Month Apr-04 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | |
| Cash | 11,156 | 19,784 | 2,345 | 10,924 | 1,035 | 10,121 | 6,536 | 19,997 | 37,372 | 25,835 |
| Other Negotiable Instruments | | | | | | | | | | |
| Accounts Receivable | 49,072 | 50,583 | 50,428 | 36,426 | 51,051 | 46,632 | 51,635 | 48,276 | 46,454 | 52,988 |
| Less Allowance for doubtful accounts | (2,813) | (2,813) | | | | | | | | |
| Inventory at Cost | 4,230 | 4,230 | 4,463 | 4,463 | 4,463 | 4,463 | 4,463 | 4,696 | 4,778 | 4778 |
| Pre-Paid Expenses & Deposits | | | | | | | | | | |
| Investments | | | | | | | | | | |
| Other: | | | | | | | | | | |
| **TOTAL CURRENT ASSETS** | 61,645 | 71,784 | 57,236 | 51,813 | 56,549 | 61,216 | 62,634 | 72,968 | 88,604 | 83,601 |
| PROPERTY PLANT AND EQUIPMENT, AT COST | 10,000 | 10,000 | 10,000 | 10,000 | 15,423 | 15,423 | 15,423 | 15,423 | 15,918 | 15,918 |
| Less Accumulated Depreciation | | | | | | | | | | |
| NET PROPERTY, PLANT AND EQUIP. | 10,000 | 10,000 | 10,000 | 10,000 | 15,423 | 15,423 | 15,423 | 15,423 | 15,916 | 15,918 |
| OTHER ASSETS | | | | | | | | | | |
| Deposits | 3,484 | 3,484 | 9,250 | 20,112 | 20,657 | 20,657 | 20,657 | 22,907 | 22,907 | 26,000 |
| **TOTAL ASSETS** | 75,129 | 85,268 | 76,486 | 81,925 | 92,629 | 97,296 | 114,337 | 126,721 | 143,347 | 141,437 |

Form OPR-3

CASE NAME: PROSPEED NET, INC.
CASE NUMBER: 03-44857-JBR

## SUMMARY OF ACCOUNTS RECEIVABLE

MONTH ENDING: 30-Apr-04

| | TOTAL | 0-30 DAYS | 31-60 DAYS | 61-90 DAYS | OVER 90 DAYS |
|---|---|---|---|---|---|
| DATE OF FILING: 19-Aug-03 | 49,072 | 20,363 | 11,934 | 2,864 | 13,911 |
| Allowance for Doubtful Accounts | (2,813) | | | | (2,813) |
| | 46,259 | 20,363 | 11,934 | 2,864 | 11,098 |
| MONTH: 31-Aug-03 | 50,582 | 20,096 | 6,936 | 9,458 | 14,074 |
| Allowance for Doubtful Accounts | 50,582 | 20,096 | 6,936 | 9,458 | 14,074 |
| MONTH: September-03 | 50,473 | 29,889 | 7,707 | 5,210 | 9,535 |
| Allowance for Doubtful Accounts | 50,478 | 29,889 | 7,707 | 5,210 | 9,535 |
| MONTH: October-03 | 36,435 | 22,371 | 5,894 | 3,573 | 4,588 |
| Allowance for Doubtful Accounts | 36,436 | 22,371 | 5,894 | 3,573 | 4,588 |
| MONTH: November-03 | 51,051 | 28,521 | 14,808 | 2,250 | 5,470 |
| Allowance for Doubtful Accounts | 51,051 | 28,521 | 14,808 | 2,250 | 5,470 |
| MONTH: December-03 | 46,632 | 19,271 | 12,886 | 10,113 | 4,359 |
| Allowance for Doubtful Accounts | 46,632 | 19,271 | 12,886 | 10,113 | 4,359 |
| MONTH: January-04 | 51,835 | 22,155 | 8,029 | 7,771 | 15,881 |
| Allowance for Doubtful Accounts | 51,835 | 22,155 | 8,029 | 7,771 | 15,881 |
| MONTH: February-04 | 48,276 | 27,407 | 7,678 | 3,708 | 9,483 |
| Allowance for Doubtful Accounts | 48,276 | 27,407 | 7,678 | 3,708 | 9,483 |
| MONTH: March-04 | 46,456 | 22,467 | 11,210 | 2,656 | 12,349 |
| Allowance for Doubtful Accounts | 46,456 | 22,467 | 11,210 | 2,656 | 12,349 |
| MONTH: April-04 | 52,988 | 30,692 | 5,044 | 6,345 | 10,907 |
| Allowance for Doubtful Accounts | 52,988 | 30,692 | 5,044 | 6,345 | 10,907 |

CASE NAME:  PROSPEEDNET, INC

CASE NUMBER 03-<<857-JBR

## INCOME STATEMENT

Form OPR-5

MONTH ENDING:  30-Apr-04

| | Month 19-31 Aug | Month Sep-04 | Month Oct-04 | Month Nov-04 | Month Dec-03 | Month Jan-04 | Month Feb-04 | Month Mar-04 | Month Apr-04 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Revenue (Income) | 23,273 | 65,267 | 68,592 | 65,048 | 57,821 | 61,312 | 62,826 | 65,476 | 54,905 | 534,521 |
| Cost of Goods Sold | | | | | | | | | | |
| Material (Bandwidth, etc.) | | | | | | | | | | |
| Labor - Direct | 1,879 | 29,655 | 28,478 | 24,333 | 18,220 | 19,460 | 23,707 | 21,575 | 19,789 | 185,095 |
| Manufacturing Overhead | | | | | | | | | | |
| Total Cost of Goods Sold | 1,879 | 28,656 | 28,478 | 24,333 | 18,220 | 19,460 | 23,707 | 21,575 | 18,798 | 185,095 |
| Gross Profit | 21,394 | 36,611 | 40,114 | 40,715 | 39,601 | 41,852 | 39,119 | 43,901 | 46,118 | 349,426 |
| Operating Expenses | | | | | | | | | | |
| Selling and Marketing | 186 | 792 | 110 | 222 | 710 | 2,135 | 2,846 | 2,159 | 2,937 | |
| General and Administrative | 1,702 | 8,094 | 6,126 | 3,709 | 4,835 | 6,640 | 3,674 | 4,594 | 7,299 | |
| Other Personnel | 11,663 | 23,470 | 29,168 | 28,867 | 34,042 | 27,097 | 28,811 | 27,435 | 31,735 | |
| Total Operating Expenses | 13,551 | 32,356 | 37,404 | 32,798 | 39,587 | 36,671 | 35,130 | 34,188 | 41,872 | 303,558 |
| Income Before Interest, Depreciation, Taxes or Extraordinary Expenses | 7,843 | 4,255 | 2,710 | 7,917 | 14 | 5,181 | 3,989 | 9,714 | 4,245 | 45,868 |
| Interest Expense | | | | | | | | | | |
| Depreciation | | | | | | | | | | |
| Income Tax Expense (Benefit) | | | | | | | | | | |
| Extraordinary Income (Expense) | | | | | | | | | | |
| Net Income (Loss) | 7,843 | 4,255 | 2,710 | 7,917 | 14 | 5,181 | 3,989 | 9,714 | 4,246 | 45,869 |

780000

# **EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SEP 0 2 2004

|                          |   |                              |
|--------------------------|---|------------------------------|
| In Re:                   | ) | Chapter 11                   |
|                          | ) |                              |
| PROSPEED.NET, INC.       | ) | Case No. 03-44857-JBR        |
|                          | ) |                              |
|    Debtor. | ) |                              |

**RESPONSE OF THE TELEPHONE OPERATING COMPANY SUBSIDIARIES OF
VERIZON COMMUNICATIONS, INC. TO DEBTOR'S MEMORANDUM OF LAW
CONCERNING THE NON-APPLICABILITY OF 11 U.S.C. SECTION 365(b)(1)
<u>TO THE PLAN OF REORGANIZATION OF PROSPEED.NET, INC.</u>**

Pursuant to this Court's Order dated August 5, 2004, the telephone operating company

subsidiaries of Verizon Communications, Inc. ("Verizon") submit this Brief in response to the

Debtor's Memorandum Of Law Concerning The Non-Applicability of 11 U.S.C. Section

365(b)(1) To The Plan Of Reorganization of Prospeeed.net, Inc. (the "Debtor") dated August 19,

2004.

## <u>INTRODUCTION</u>

The Debtor's Memorandum of Law requests a ruling that Section 366 of the Bankruptcy

Code not only "preempts" another section of the very same statute, Section 365, but also requires

Verizon to continue to provide the same services and facilities to the Debtor, post-confirmation

and apparently continuing forever, on the same terms as specified in the parties' existing

agreements under which the Debtor ordered those services and facilities in the first place,

notwithstanding the Debtor's apparent intent to reject those very agreements under its proposed

Plan dated June 10, 2004 (the "Plan"). That relief would be unprecedented and extraordinary.

As shown herein, the Debtor's argument is devoid of any legal support, ignores the plain

language of Section 366, violates one of the most fundamental principles of statutory construction (that two sections of the same statute should be construed in harmony rather than in conflict), and would, if adopted, create an utterly unworkable process under which this Court would be required to decide future disputes over adequate assurance in perpetuity long after the Debtor emerged from bankruptcy and the Court's jurisdiction waned.

To Verizon's knowledge, there is no viable authority for the proposition that a telecommunications company or other provider of so-called "utility services" must continue to provide those services and facilities, ordered under and furnished pursuant to written contracts, to a reorganized debtor, post-confirmation, absent the debtor's assumption of the contracts in compliance with Section 365.[1]  Indeed, since 1996, Verizon has been a creditor in approximately 160 Chapter 11 and Chapter 7 telecommunications cases in which the debtors owed Verizon sums arising under prepetition interconnection and other agreements.  In virtually all of the Chapter 11 cases, except where the debtors liquidated or exited the relevant markets, the debtors have assumed their interconnection agreements and tariff arrangements with Verizon and paid Verizon substantial amounts – in many cases, tens of millions of dollars – to cure their defaults, typically pursuant to stipulations approved by the bankruptcy courts.[2]  Affidavit of Sharolyn

---

[1]    In passing, the Debtor suggests, more by way of surmise than argument, that the parties' interconnection agreements and tariffs may not be executory contracts within the meaning of Section 365. The Debtor fails to cite a single case to support this suggestion, and it is contrary to the bankruptcy courts', and the parties', treatment of these agreements in literally dozens upon dozens of cases. See, e.g., Net2000, infra, p. 6; n. 2, infra. Moreover, on Schedule G of its Bankruptcy Schedules, the Debtor itself listed its prepetition agreements with Verizon as executory contracts. This admission is binding on the Debtor. See In Re Wolcott, 194 B.R. 477, 483 (Bankr. D. Montana 1996) ("... the Court may consider Wolcott's ... Schedules ... as evidentiary admissions made by Wolcott when offered by the Trustee, a party opponent."); In Re Kaskel, 269 B.R. 709, 715 (Bankr. D. Idaho 2001) ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions.").

[2]    In WorldCom, for example, the debtors assumed substantially all of their agreements with Verizon and paid Verizon $60 million in cash, 100% of the net amount the parties agreed that WorldCom owed to Verizon for prepetition services (after the debtors had already assumed two other contracts and paid an additional approximately $60 million in cash). See Hessenthaler Affidavit, ¶ 3. The following is a partial list of additional cases, in each of

Hessenthaler (which is attached hereto as Exhibit A), ¶ 3. There is nothing unique about this case, and there is reason why the result should be any different here.

## FACTUAL BACKGROUND:

The Debtor commenced this case under Chapter 11 of the United States Bankruptcy Code on August 19, 2003 (the "Petition Date"). The Debtor is a telecommunications provider of Internet service and related data services to retail customers, primarily using digital subscriber line ("DSL") technology. To provide such services to its customers, the Debtor must, in turn, obtain a variety of telecommunications services and facilities from Verizon, including collocation, access, and unbundled network elements. The Debtor obtains such services and facilities from Verizon under a series of executory contracts, principally interconnection agreements.[3]

At the time it filed for bankruptcy, the Debtor was in substantial default of its payment obligations to Verizon under the parties' agreements. Accordingly, on September 15, 2003,

---

which the debtors have assumed interconnection agreements (and/or tariff arrangements or other contracts) with Verizon and paid a cure under Section 365 of the Bankruptcy Code:

In re WorldCom, Inc., 02-13533 (Bankr. S.D.N.Y.); In re Allegiance Telecom, Inc., 03-13057 (S.D.N.Y.); In re Global Crossing Ltd., 02-40188 (Bankr. S.D.N.Y.); In re CTC Communications Group, Inc.,. CTC Communications Corp., CTC Communications of Virginia, Inc., and CTC Communications Leasing Group, 02-12873 (Bankr. D. Del.); In re Network Plus Corp., 02-10341 (Bankr D. Del.); In re Network Access Solutions Corp. & NASOP, Inc., 02-11611 and 02-11612 (Bankr. D. Del.); In re Adelphia Business Solutions, Inc., 02-11389 (Bankr. S.D.N.Y.); In re Arch Wireless, Inc., 01-47330 (Bankr. D. Mass.); In re ATS Telecomms. Systems, Inc., 01-33453 (Bankr. S.D. Tex.); In re Cable & Wireless USA, Inc., 03-13711 (Bankr. D. Del.); In re EXDS, Inc. (f/k/a Exodus Communications, Inc.), 01-10539 (Bankr. D. Del.); In re FastNet Corp., 03-23143 (Bankr. E.D.Pa.); In re Focal Communications Corp., 02-13709 (Bankr. D. Del.); In re Genuity Inc., 02-43558 (Bankr. S.D.N.Y.); In re Logix Communications Corp. and Logix Communications Enters., Inc., 02-32105 and 02-32106 (Bankr. S.D. Tex); In re Mpower Holding Corp., 02-11046 (Bankr. D. Del.); In re Northpoint Communications Group, Inc., 01-30127 (Bankr. N.D. Cal.); In re Plan B Communications, Inc., 01-11443 (Bankr. S.D.N.Y.); In re Telscape Int'l, Inc., 01-1563 (Bankr. D. Del.); In re PSINet Inc., 01-13213 (Bankr. S.D.N.Y.); In re Rhythms NetConnections Inc., 01-14283 (Bankr. S.D.N.Y.); In re RSL Com PrimeCall, Inc. and RSL Com U.S.A., Inc., 01-11457 and 01-11469 (Bankr. S.D.N.Y.); In re Teligent, Inc., 01-12974 (Bankr. S.D.N.Y.); In re TSR Wireless, LLC, 00-441857 and 00-41858 (Bankr. D.N.J.); In re Usinternetworking, Inc., 02-50215 (Bankr. D. Md.); and In re World Access, Inc., 01-1286 (Bankr. D. Del.).

[3]    By way of example, Verizon has attached hereto a copy of its interconnection agreement in Massachusetts with the Debtor. See Exhibit B.

Verizon filed the Motion Of The Operating Subsidiaries Of Verizon Communications, Inc. For (A) Relief From the Automatic Stay Pursuant To Section 362(d) Of The Bankruptcy Code To Terminate Service, Or, In The Alternative, (B) For Adequate Assurance Of Payment For Future Utility Services Pursuant To Section 366 Of The Bankruptcy Code (the "Lift Stay Motion"). At the initial hearing on Verizon's Lift Stay Motion held on September 25, 2003, the Court entered an Order requiring the Debtor to pay Verizon: (i) $13,000.00 on or before September 26, 2003; (ii) each week, commencing on September 26, 2003, $3,250.00; and (iii) a deposit of $13,000.00 to be made on October 26, 2003 (the "September 2003 Order"). At a continued hearing on Verizon's Lift Stay Motion held on October 30, 2003, the Court entered an Order requiring the Debtor to make future adequate assurance payments in accordance with the September 2003 Order. Finally, on January 22, 2004 the parties entered into a Stipulation And Order on the Lift Stay Motion that required the Debtor to make continued adequate assurance payments as more specifically set forth therein.

Many months had passed and the Debtor had not filed a Plan. On March 30, 2004 the parties filed a Joint Motion For Entry Of An Order: (1) Further Continuing Hearing Date On Lift Stay Motion Of Verizon Communications, Inc. And (2) Establishing Deadline For The Debtor To File A Disclosure Statement And Plan by May 14, 2004. On the same day, March 30, 2004, the Court entered an Order granting the Motion and directing the Debtor to file its Disclosure Statement and Plan by May 14.

But the Debtor failed to do so — it filed neither a Disclosure Statement nor a Plan -- by the May 14, 2004 deadline and also neglected to file a motion seeking an extension of that deadline. At a continued hearing on Verizon's Lift Stay Motion on June 3, 2004, the Court entered another Order, this time requiring the Debtor to file a Disclosure Statement and Plan by June 11, 2004,

with the Debtor's case to be converted to Chapter 7 if the Debtor failed to comply with the Court's Order. Facing this potential sanction, the Debtor finally filed its Disclosure Statement and Plan on June 10, 2004.

But the Debtor complied with this Court's direction in form only. Among other defects, the Plan that the Debtor proposed (a) did not provide for the assumption of a single executory contract or unexpired lease (and the Disclosure Statement failed to explain how the Debtor could remain in business without doing so); (b) provided for unsecured creditors to recover at most 20 cents on the dollar, yet also provided for the Debtor's insiders to retain all their equity in the company; and (c) failed to address how the Debtor intended to resolve any claims against the estate, since the Debtor has never moved for a bar date for the filing of such claims. In light of the Plan's plain failings, on July 19, 2004 Verizon filed the Objection Of The Operating Telephone Company Subsidiaries Of Verizon Communications, Inc. To The Debtor's Disclosure Statement. In that Objection, Verizon argues that the Bankruptcy Court should deny approval of the Disclosure Statement because the Plan it describes is unconfirmable as a matter of law and the Disclosure Statement lacks adequate information to permit creditors to vote on the Plan. Among the fatal flaws Verizon identified in the Debtor's Plan are:

- The Plan does not cure, or provide adequate assurance that it will promptly cure, prepetition arrearages due to Verizon in violation of Section 365 of the Code;

- The Plan violates Section 1129(b) of the Code by providing that existing shareholders will retain their equity in the Debtor even though the holders of allowed general unsecured claims will not be paid in full;

- The Plan is not feasible within the meaning of Section 1129(a)(11) of the Code.

On August 5, 2004 the Court held a hearing on the Debtor's request for approval of the Disclosure Statement. Debtor's counsel requested permission to brief the issue of whether the Debtor is required to assume its executory contracts with Verizon and satisfy the provisions of Section 365 in order to continue to receive the same-contractually ordered services and facilities from Verizon after confirmation of a Chapter 11 Plan. On August 19, 2004 the Debtor filed its Memorandum Of Law Concerning Non-Applicability Of 11 U.S.C. 365(b)(1) To The Plan of Reorganization Of Prospeed.net, Inc. Verizon responds thereto in this Brief.

## ARGUMENT

The Bankruptcy Code does not authorize the truly extraordinary result that the Debtor seeks – a requirement that Verizon continue indefinitely, after the Debtor emerges from bankruptcy pursuant to a confirmed Plan, to provide the same services and facilities as the Debtor ordered, and Verizon furnished, under interconnection and agreements other executory contracts, notwithstanding the Debtor's rejection of those very contracts. The Debtor's argument for such an illogical and inequitable result fails for numerous reasons.

### 1.    By Its Terms, Section 366 Has No Application Post-Confirmation.

The Debtor's Memorandum of Law requests a ruling that Section 366 "preempts" Section 365 and requires Verizon to continue to provide the same services and facilities to the Debtor, post-confirmation, on the same terms as they are currently provided under the parties' existing agreements, even after the Debtor rejects those very agreements under its Plan. Section 366 provides the Debtor with no support. It specifies:

> (a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the <u>trustee</u> or the <u>debtor</u> solely on the basis of the commencement of a case under this title or that a debt owed by the <u>debtor</u> to such utility for service rendered before the order for relief was not paid when due.

> (b) Such utility may alter, refuse, or discontinue service if neither the <u>trustee</u> nor the <u>debtor</u>, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

11 U.S.C. § 366 (<u>emphasis added</u>). By its terms, thus, Section 366 applies to a utility that is furnishing service to a "debtor" or "trustee." Section 366 cannot be read to have any continued vitality post-confirmation when there is no longer a "debtor" or "trustee." Rather, it applies only "during the pendency of the bankruptcy case[.]" <u>Collier Pamphlet Edition – Bankruptcy Code – Part I</u> 317 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 2003).

Bankruptcy courts have made it clear that nothing in the Bankruptcy Code requires Verizon to continue to provide the contractual services and facilities to a Chapter 11 debtor or to a buyer of its assets if the debtor does not assume, or assume and assign under Section 365, its existing telecommunications agreements pursuant to which Verizon furnishes those services and facilities. In the <u>Net2000</u> case, for example, the debtors sold their operations to another competitive local exchange carrier ("CLEC"), but the sale order did not provide for the assumption and assignment of the debtors' interconnection agreements and service arrangements by tariff to the buyer (Cavalier). Judge Walrath concluded that, because there had been no assumption and assignment, neither the debtors nor the buyer needed to cure the defaults under the Verizon agreements but, by the same token, that nothing in the Bankruptcy Code gave the buyer any right to any of the services and facilities that Verizon had provided to the debtor under the rejected agreements:

> Since there has been no assumption and assignment of the Verizon Contracts to Cavalier under 11 U.S.C. § 365, neither the Sale Order nor this Order nor any other Order of this Court: (i) grants

Cavalier the right to use, issue orders with respect to, demand migration of, or obtain any benefit from, either directly or indirectly, any of the services and facilities provided by Verizon to the Debtors pursuant to the Verizon Contracts..., (ii) directs Verizon to do anything to transfer any of the Debtors' end users to Cavalier or its network, (iii) grants Cavalier any right to insist that any circuit or facility, or any portion thereof, used to serve the Debtors' end users be used to process orders submitted by Cavalier or that any new order by Cavalier be processed simultaneously or otherwise coordinated with disconnect orders submitted by the Debtors, or (iv) otherwise requires Verizon to process any orders submitted by Cavalier designed to facilitate Cavalier's services to end users formerly served by the Debtors or to shorten any provisioning intervals for such orders.

In re Net2000 Communications, Inc., Order Regarding the Emergency Motion of the Operating Subsidiaries of Verizon Communications Inc. to Require Debtors and Cavalier Telephone Company to Cure Defaults Under the Debtors' Contracts with Verizon and for Contempt, Case No. 01-11324 (MFW) (Bankr. D. Del. Feb. 13, 2002) (a copy of which is attached hereto as Exhibit C). Indeed, while Judge Walrath made clear that both the buyer and Verizon could seek, from regulatory agencies or in other forums, whatever relief to which they might be entitled under applicable non-bankruptcy law, she barred the buyer from making "any representation to any other court, state or federal regulatory body, or any other entity" that, under bankruptcy law, any order entered in the bankruptcy case required Verizon to provide to the buying CLEC any of the services and facilities Verizon had provided to the debtors. Id. at ¶ 3.

## 2.    The Debtor's Construction of Section 366 Would Nullify Section 365.

The Debtor argues that Section 366 "preempts" Section 365. In so contending, the Debtor implicitly admits what is obvious – that its argument that it can require Verizon to continue to provide it with the same contractually-ordered services and facilities notwithstanding its rejection of the relevant executory contracts is contrary to the terms of Section 365 (hence, the Debtor's argument that Section 365 is "preempted"). The whole thrust of Section 365 is that the

debtor has a choice with respect to each of its executory contracts and unexpired leases. It may assume such a contract or lease, in which case it can continue to obtain the benefits of the agreement, but it must cure any defaults thereunder. 11 U.S.C. § 365(a) & (b). Alternatively, it may reject the agreement, in which case it need not cure any defaults but it also cannot require the counter-party to continue to perform. And the debtor must make this choice by plan confirmation – i.e., if the debtor wants post-confirmation to continue to obtain the benefits of the contract, it must assume the agreement by confirmation. Id. § 365(d)(2).

The Debtor's argument here would render § 365 a nullity, at least whenever the contract at issue is deemed to be one for "utility services." The Debtor could have its cake and eat it too – it could reject the contract but still demand that the counter-party continue, after confirmation, to provide all the same services and facilities. The guts of Section 365 would be torn out.

The Debtor does not dispute any of this. It makes no attempt to reconcile its argument with the plain meaning of Section 365. Rather, precisely because it knows that its argument is directly contrary to the language of Section 365, it claims that Section 365 should be disregarded – that it is somehow "preempted" by Section 366.

The Debtor's "preemption" argument is dead wrong. At the outset, the doctrine of preemption has no applicability here where the issue is how to reconcile two sections of the same federal statute. Preemption applies where Congress, exercising its powers under the Supremacy Clause of the Constitution, expressly or implicitly preempts state law. It has no applicability where two federal statutes are at issue (let alone where two sections of the same federal statute apply). See, e.g., Randolph v. IMBS, Inc., 368 F.3d 726, 730 (7th Cir. 2004) ("The district court wrote that § 362(h) [of the Bankruptcy Code] 'preempts' [the Fair Debt Collection Practices Act], but this cannot be right. One federal statute does not preempt another."). Rather, "[w]hen

two federal statutes address the same subject in different ways, the right question is whether one implicitly repeals the other – and repeal by implication is a rare bird indeed. . . . It takes either irreconcilable conflict between the statutes or a clearly expressed legislative decision that one replace the other." Id. (citations omitted).

This rule of law – that one federal statute should not be read to nullify another – has particular force where the two provisions at issue are sections of the same statute (in this case, the Bankruptcy Code). See, e.g., Bennett v. Spear, 520 U.S. 154, 173 (1997) ("It is the 'cardinal principle of statutory construction'... [that] [i]t is our duty 'to give effect, if possible, to every clause and word of a statute' rather that to emasculate an entire section.") (citations omitted).

There is nothing in the language of either Section 365 or Section 366 that remotely suggests, let alone sets forth a "clearly expressed legislative decision," that Congress intended Section 366 to "replace" Section 365 and render it a nullity with respect to contracts for the provision of "utility services." On the contrary, Section 365 expressly applies to "any" executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). And, while it specifies that certain other sections of the Code may override its terms in certain circumstances, it makes no reference to Section 366. Id. ("Except as provided in sections 765 and 766 of this title . . . the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.") (emphasis added). Similarly, Section 366 contains no reference to Section 365, let alone any sort of suggestion that Congress intended to override Section 365 (such as a "Notwithstanding-anything-to-the-contrary-in-Section-365" clause at the beginning of the Section).

It is thus clear that Section 366 must be read not to "preempt" Section 365 but rather in harmony with Section 365 – that both sections must be given effect. The Debtor's argument

here would have just the opposite effect – it would gut Section 365.  As another bankruptcy court stated in rejecting essentially the same argument:

> The debtor cannot reject under 11 U.S.C. § 365 and accept under 11 U.S.C. § 366 once the twenty-day period has run from the date of the order for relief.  To so allow would emasculate the creditor's remedies under § 365 and permit the debtor to totally circumvent the effect of rejection while retaining the fruits of the contract through § 366.  This was not the intent of the Code and will not be here permitted.").

In re Kentech Corp., 36 B.R. 552, 553 (Bankr. W.D. Ky. 1983).

The way to reconcile Sections 365 and 366 is clear from their plain language.  As noted, by its very terms, Section 366 applies only to a "debtor" or "trustee" – not to a reorganized entity that has emerged from bankruptcy and is, therefore, no longer a "debtor."  And, as also noted, Section 365 expressly affords the debtor (unless the bankruptcy court orders otherwise) until confirmation to decide whether to assume or reject its executory contracts.  Thus, Sections 365 and 366 can be read in harmony by construing Section 366 to allow a debtor, before confirmation of a plan and any rejection of the executory contract under which it obtains service, to continue to obtain such service (as long as it furnishes adequate assurance of payment), and by reading Section 365 to require the debtor, by the time of plan confirmation, to assume that contract if it wants to continue to obtain the same contractually-ordered services post-confirmation.  This is precisely how the two sections have, in effect, been reconciled in all the other chapter 11 telecommunications cases in which the debtors have obtained continued post-petition services from Verizon during the pendency of the case after providing adequate assurance of payment under Section 366, and have, by confirmation, assumed their interconnection agreements and other contracts with Verizon pursuant to Section 365, so that they may maintain those contractual benefits post-confirmation.  See n.2, supra.

3. **The Debtor's Construction of Section 366 Would, If Adopted, Require the Court to Retain Impermissibly Broad Jurisdiction Post-Confirmation.**

The Debtor's contention that Section 366 applies post-confirmation should be rejected not only because it is both contrary to the plain meaning of Section 366 and would nullify Section 365. It also would, if adopted, create an utterly unworkable situation, in conflict with the basic rules of bankruptcy court post-confirmation jurisdiction.

Under the Debtor's position, this Court would be required to retain jurisdiction post-confirmation in perpetuity to resolve disputes arising under Section 366. Section 366 affords the bankruptcy court the power, after notice and hearing, to order "reasonable modification" to the amount of the Debtor's deposit or other form of adequate assurance of payment, and authorizes any party in interest the right to seek such relief. 11 U.S.C. § 366(b). Thus, if Section 366 applies post-confirmation, bankruptcy courts would have to consider – for years on end, indeed forever – requests by the utility or the reorganized debtor for modification of the adequate assurance based on the reorganized debtor's post-confirmation financial condition and performance. In this case, for example, this Court would, be required -- 5, 10, 20, 30 or more years from now -- to consider whether the terms it has approved to date for adequate assurance of payment remain adequate, based not on the Debtor's pre-petition financial performance and condition or its performance and condition during this Chapter 11 case, but instead based on reorganized Prospeed's performance and condition after it emerges from bankruptcy and is no longer a debtor.

Such an active, ongoing, supervisory role for this Court would fundamentally conflict with the oversight of the Federal Communications Commission and Massachusetts Department of Telecommunications And Energy for competitive local exchange carriers after they emerge

from bankruptcy. It would also be inconsistent with the very limited jurisdiction that bankruptcy courts may exercise following confirmation of a plan. See, e.g., In re Resorts International, Inc., 372 F.3d 154, 164 (3d Cir. 2004) ("bankruptcy court jurisdiction 'must be confined within appropriate limits and does not extend indefinitely, particularly after confirmation of a plan and the closing of a case'") (citation omitted); Pettibone Corp. v. Easley, 935 F.2d 120, 122 (7th Cir. 1991) ("'Once the bankruptcy court confirms a plan of reorganization, the debtor may go about it business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens.'") (emphasis in original) (citation omitted); Bank of La. V. Craig's Stores of Tex., Inc. (In re Craig's Stores of Texas, Inc.), 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."); ICCO Design/Build, Inc. v. Sunbrite Cleaners, Inc. (In re Sunbrite Cleaners, Inc.), 284 B.R. 336, 339-40 (N.D.N.Y. 2002) ("as a general rule, a bankruptcy court's jurisdiction extends until the debtor's plan of reorganization has been confirmed."); In re Baker, 118 B.R. 24, 27 (Bankr. S.D.N.Y. 1990) ("[T]he court retains limited post-confirmation jurisdiction pursuant to 11 U.S.C. § 1142 for the purpose of implementing the plan").

4.   **The Debtor's Legal Authority Undermines, Rather Than Supports, Its Argument That Section 366 Applies Post-Confirmation.**

The Debtor cites only two cases to support its argument that Section 366 "preempts" Section 365 and requires Verizon to continue to provide the same services and facilities to the Debtor, post-confirmation, on the same terms, as under the parties' prepetition agreements, even after the Debtor rejects those agreements. See In re Monroe Well Service, Inc., 83 B.R. 317

(Bankr. E.D. Pa. 1988); <u>In re Gehrke</u>, 57 B.R. 97 (Bankr. D. Oregon 1985). Neither case, in fact, supports the Debtor's position.

In both <u>Gehrke</u> and <u>Monroe Well Service</u>, the utility filed a motion to compel the debtor to assume or reject its prepetition agreements <u>before</u> confirmation. In each case the utility sought to terminate service to the debtor prior to confirmation, notwithstanding the debtor's compliance with Section 366. In each case, perhaps not surprisingly, the court denied the utility's motion to compel assumption or rejection prior to confirmation.

Neither <u>Gehrke</u> nor <u>Monroe Well Service</u> supports the proposition that Section 366 has continued vitality <u>after</u> confirmation. The Bankruptcy Court's holding in <u>Gehrke</u>, denying the utility's motion to compel assumption or rejection prior to plan confirmation makes no mention of the debtor's filing of any plan, and there is no language in the decision remotely suggesting that Section 366 continues to apply post-confirmation. In <u>Monroe Well Service, Inc.</u>, the Court's holding was likewise limited; the court specified that it was declining "to require the debtors to assume or reject <u>prior to</u> confirmation." 83 B.R. at 323 (emphasis added).

To the extent that there is dictum in <u>Monroe Well Service</u> suggesting that the debtor could continue, after confirmation, to demand the provision of services from the utility even if it rejected the contract under which those services had been provided, the case has been implicitly overruled by Court of Appeals precedent from the same Circuit. In <u>Sharon Steel Corp. v. National Fuel Gas Distribution Corp.</u>, 872 F.2d 36 (3rd Cir. 1989), the debtor was a party to a natural gas supply contract with National Fuel Gas Distribution Corp. After the petition date, the state public utilities commission which regulated the industry approved new gas rates that were less than the rates National Fuel was charging the debtor under the contract. Moreover, applying state public utility law (not federal bankruptcy law), the state commission entered an order

directing National Fuel "to continue providing service despite [the debtor's] rejection of the service agreement." 872 F.2d at 39. Accordingly, the debtor moved to reject the contract. The bankruptcy court entered an order granting the debtor's motion over National Fuel's objection. On appeal, National Fuel argued that the rejection was "improper" because it was being forced under the state commission order to continue to provide service anyway. The Third Circuit rejected this argument, but only after making it clear that "National Fuel could petition the [state commission] to terminate service to Sharon ... and the disposition of this action has no effect on their right to do so." Id. at 40 (emphasis added). This statement is wholly at odds with the dictum in Monroe Well Service, and with the Debtor's argument here, for National Fuel would have been unable in any event to terminate service under Section 366 of the Bankruptcy Code if the Third Circuit had followed the Monroe Well Service dicta and accepted the Debtor's argument.

In short, Monroe Well Service provides no support for the Debtor. Indeed, even if the dicta from that case were good law – and it plainly is not after Sharon Steel – it would undermine, not bolster, the Debtor's position. The court in Monroe Well Service rejected the very argument that the Debtor is making here:

> I cannot accept the debtors' argument that executory contracts are not affected by § 365 if one party to the contract is a utility company. ... There is nothing is § 366 which permits the debtor to retain the benefits of an executory utility contract without fulfilling its obligation.

83 B.R. at 322. The court thus made clear that, if the debtor rejected the relevant contract, it would have to forfeit the benefit of that agreement, including any favorable terms and provisions. All the court suggested, in its dicta, was that the debtor could obtain under Section 366 newly-ordered services under a new contract, consistent with the normal terms applied to new

customers by the utility. Id. But, here, the Debtor is not merely asking Verizon to provide it with newly-ordered circuits or generic telecommunications services under Section 366, but rather the very same circuits, services, service arrangements, and other facilities that the Debtor ordered and that Verizon provisioned under the existing interconnection agreements, something that Section 365 and even the now-rejected dicta in Monroe Well Service make clear the Debtor can require only if it assumes those agreements and cures the defaults thereunder.

5.   **Even If Section 366 Applied Post-Confirmation, It Would Not Require to Verizon to Continue to Provide the Contractually-Ordered Services and Facilities Following the Debtor's Rejection of the Relevant Contracts.**

The Debtor's argument must be rejected for another reason as well: Even if Section 366 were at all applicable following confirmation of a chapter 11 plan, Verizon would not be violating it by insisting that the Debtor assume its prepetition agreements and cure its defaults if the Debtor wishes to obtain Verizon's continued performance after confirmation of the Plan.

The wording of Section 366 makes this clear. As the Supreme Court has repeatedly held, the Bankruptcy Code must be construed in accordance with it plain meaning. See, e.g., BFP v. Resolution Trust Corp., 511 U.S. 531, 552 (1994) (party seeking to defeat plain meaning of the Bankruptcy Code bears an "exceptionally heavy burden") (quoting Patterson v. Shumate, 504 U.S. 753, 760 (1992) (internal quotation marks omitted); Perrin v. United States, 444 U.S. 37, 42 (1979) (statutory words should be given their ordinary meaning). By its express terms, Section 366 bars a utility from altering, refusing or discontinuing service to a debtor only if the utility so acts "solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due." 11 U.S.C. § 366(a).

If Verizon exercised its rights under Section 365 to decline to continue to provide the same services and facilities following the Debtor's rejection of its interconnection agreements,

Verizon would not be so acting "solely" – indeed, at all – on the basis of either the commencement of the Debtor's case or the Debtor's failure to pay its prepetition payables "when due" (i.e., before the Debtor filed for bankruptcy); on the contrary, Verizon has continued to provide the same services and facilities to the Debtor throughout this bankruptcy case, notwithstanding the Debtor's filing for bankruptcy and its failure to pay its prepetition payables when due. Rather, Verizon would be taking action because of the Debtor's failure to assume the relevant executory contract upon confirmation of the Debtor's plan and to cure its defaults at that time under Section 365. Accordingly, even if it applied at all post-confirmation – and it plainly does not – Section 366 would not allow the Debtor to obtain a windfall by requiring Verizon to continue to provide to reorganized Prospeed the same services and facilities the Debtor has obtained under executory contracts notwithstanding the Debtor's rejection of those contracts and failure to cure the defaults thereunder.

**CONCLUSION**

For the foregoing reasons, the telephone operating company subsidiaries of Verizon Communications, Inc. respectfully request that the Court enter an order denying the Debtor's request for a ruling that Section 366 "preempts" Section 365 and requires Verizon to continue to provide the same contractually-ordered and provisioned services and facilities to the Debtor, post-confirmation, absent the Debtor's assumption of the contracts in compliance with Section 365.

Respectfully submitted,

THE TELEPHONE OPERATING
COMPANY SUBSIDIARIES OF VERIZON
COMMUNICATIONS, INC.

By Their Attorneys,

/s/ Mark W. Powers
Mark W. Powers (BBO #555337)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA  01615-0156
Tel: (508) 791-3511

and

Philip D. Anker
Joel Millar
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY  10022
Tel: (212) 230-8800

DATED:  September 2, 2004

# **EXHIBIT E**

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MASSACHUSETTS - WORCESTER

```
==============================
```

IN THE MATTER OF:                    .    Case #03-44857

    PROSPEED.NET, INC.              .    Worcester, Massachusetts
                                .    **September 9, 2004**
               Debtor        .    10:14 a.m.

```
==============================
```

## TRANSCRIPT OF HEARING ON:
### (#57) MOTION TO APPROVE DISCLOSURE STATEMENT OF PROSPEED.NET, INC., DATED 6-10-04;
### (#62) OBJECTION OF THE OPERATING TELEPHONE COMPANY;
## BEFORE THE HONORABLE JOEL B. ROSENTHAL, JR., J.U.S.B.C.

APPEARANCES:

For the Debtor:

                                   TIMOTHY M. MAUSER, ESQ.
                                   Mauser & Mauser
                                   180 Canal Street
                                   Boston, MA  02114

For Verizon Communications, Inc:

                                   MARK W. POWERS, ESQ.
                                   Bowditch & Dewey
                                   311 Main Street
                                   P.O. Box 15156
                                   Worcester, MA  01615

For the U.S. Trustee:

                                   RICHARD A. KING, AUST
                                   Office of the U.S. Trustee
                                   446 Main Street, 14th Fl
                                   Worcester, MA  01608

Electronic Sound Recording Operator:   Leah DiDonato

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
1-609-927-0299    FAX 1-609-927-6420    1-800-471-0299
e-mail - irwingloria@comcast.net

Page 2

1  (At Tape #1, Index #2760  10:14 a.m.)

2          MS. MAGEROWSKI:   Prospeed.Net, Incorporated. Case

3  #03-44857.   Please identify yourselves for the record.

4          MR. MAUSER:   Timothy Mauser for Prospeed.

5          MR. GOLDEN:   Chris Golden, President of Prospeed.

6          MR. POWERS:   Good morning, Your Honor.   Mark Powers

7  for Verizon Communications.

8          MR. KING:   Good morning.   Richard King for the U.S.

9  Trustee.

10          THE COURT:   Thank you, gentlemen, for your memoranda

11  with respect to the -- the Verizon memo must still be in

12  chambers, but I don't think I need it.   No, that's all right.

13          I have read the memoranda, and I have studied the

14  issue and read the cases, and I must say that I agree with

15  Verizon's position.   I do not believe that the two sections can

16  be read the way Mr. Mauser suggests is the appropriate way of

17  reading them.   I think the way that Verizon argues that they

18  should be read, so that 365 and 366 can be read in concert, is

19  the appropriate way to read them, and I do not believe 366

20  trumps 365.   Therefore -- and that is my ruling on that issue.

21          Where does that leave you and the proposed plan and

22  disclosure statement, Mr. Mauser?

23          MR. MAUSER:   Your Honor, while we were working on

24  the memorandums, Verizon and Prospeed executives were

25  discussing a manner of resolving this particular issue, and

#03-44857

9-9-04

1  there is an offer on the Pros -- on the table from Prospeed to

2  Verizon with respect to dealing with the 365/366 issue, as well

3  as the -- obtaining more contributions from the shareholders of

4  the -- of Prospeed.

5  So I think we have a viable plan, even though, of

6  course, this decision today puts a strain on the plan itself,

7  unless we can resolve --

8  THE COURT:    So what do you want me to do?  You want

9  me to deny this disclosure statement, give you an opportunity

10  to file an additional one?  You want me to leave it open so

11  that you can amend it, rather than go through the process of

12  starting all over again?  What's your pleasure?

13  MR. MAUSER:    I think I would prefer amending the

14  disclosure statement upon obtaining, hopefully resolving the

15  current negotiations with Verizon.  However, since it may be

16  impossible to propose a feasible disclosure statement with a

17  100 per cent payment up front for Verizon, there may be -- we

18  may have a need to appeal this motion, appeal this ruling on an

19  interlocutory basis because it is just so critical -- may be --

20  not right now, but it may be so critical to the  outcome of the

21  case.

22  THE COURT:    Right, but when I -- I've got to deny

23  your disclosure statement so you can have something to appeal,

24  if you want to.

25  MR. MAUSER:    Could -- could we --

1          THE COURT:    Do you want me to -- what do you want me

2   to do?

3          MR. MAUSER:    I would like the opportunity to have

4   Verizon and Prospeed conclude the current negotiations; and if

5   that's the case, then amending the disclosure statement as

6   previously proposed would be the best result for everyone.

7   Barring a very quick resolution of those negotiations, to then

8   request that you deny the disclosure statement so we could take

9   an appeal on this ruling today would strike me as necessary --

10  may strike me as necessary, pending what Prospeed's decisions

11  are today, as a result of the ruling.    Which is --

12          THE COURT:    Mr. Powers.

13          MR. POWERS:    Your Honor, perhaps Mr. Mauser and I

14  can confer for a second, and that would --

15          THE COURT:    Sure.

16      [Pause]

17          MR. POWERS:    Your Honor, I can confirm that a

18  proposal was -- was made by Prospeed to Verizon.    I can also

19  communicate that it's not a proposal that was terribly

20  attractive to Verizon.    But I think what would make sense here

21  is for that to play out over, say, the next two weeks, and for

22  Mr. Mauser to either file an amended disclosure statement in

23  two weeks, and if he doesn't do so, an order would enter

24  denying his disclosure --

25          THE COURT:    Rather than to foreclose, why don't I

#03-44857

9-9-04

Page 5

1  just make a note that the parties are negotiating, and you'll

2  advise me, and I'll just put this back on, and I won't enter

3  any order --

4          MR. POWERS:    That's fine.

5          THE COURT:    -- for a couple of weeks, and we'll --

6  you'll come back here, and we'll see where we are at the time.

7          MR. POWERS:    That's fine.

8          THE COURT:    Give me a date a couple of weeks out,

9  please.

10          MS. MAGEROWSKI:    The 23rd at 10:30.

11          THE COURT:    September 23rd at 10:30 a.m.    Thank you.

12          MR. POWERS:    Thank you, Your Honor.

13          MR. MAUSER:    Thank you, Your Honor.

14          THE COURT:    Thank you, gentlemen.

15  (End at Tape #1, Index #3200.   10:20 a.m.)

16              *  *  *  *  *  *  *  *  *  *  *

17          I certify that the foregoing is a true and accurate

18  transcript from the electronically sound recorded record of the

19  proceedings.

_____        9/25/04
GLORIA C. IRWIN                              Date
Certified Transcriber NJ AOC200      Federal CET #122
GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ 08234-5901
609-927-0299  1-800-471-0299    FAX 609-927-6420
e-mail  irwingloria@comcast.net

#03-44857                                    9-9-04